[Cite as *State v. Monahan*, 2018-Ohio-4633.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**DARKE COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 2018-CA-2 |
| | : | |
| v. | : | Trial Court Case No. 2017-CR-174 |
| | : | |
| RYAN M. MONAHAN | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 16th day of November, 2018.

. . . . . . . . . . .

JAMES D. BENNETT, Atty. Reg. No. 0022729, Assistant Prosecuting Attorney, Darke County Prosecutor's Office, 504 South Broadway Street, Greenville, Ohio 45331
    Attorney for Plaintiff-Appellee

JOSE M. LOPEZ, Atty. Reg. No. 0019580, 18 East Water Street, Troy, Ohio 45373
    Attorney for Defendant-Appellant

. . . . . . . . . . . . .

WELBAUM, P.J.

{¶ 1} This case is before the court on the appeal of Ryan Monahan from his conviction and sentence on one count of aggravated assault with a firearm specification. After a bench trial, the court found Monahan not guilty of four counts of felonious assault, with firearm specifications, and one charge of tampering with evidence, but found him guilty of one count of aggravated assault, with a firearm specification.   The court imposed a mandatory three-year term of imprisonment for the firearm specification and 60 months of community control for the aggravated assault conviction.

{¶ 2} Monahan contends that trial counsel rendered ineffective assistance of counsel by failing to qualify a proper expert for an impossibility defense and by failing to argue self-defense.   Monahan further argues that the court's verdict was against the manifest weight of the evidence and that the court erred by denying his trial counsel's request to withdraw.

{¶ 3} For the reasons discussed below, we conclude that no error occurred in the trial court and that trial counsel did not render ineffective assistance of counsel. Accordingly, the judgment of the trial court will be affirmed.

I.   Facts and Course of Proceedings

{¶ 4} This case involved an altercation between Monahan and four juveniles that occurred late in the evening on June 9, 2017.   At the time, one of the juveniles, J.B., age 17, was driving his father's pickup truck.   Earlier in the day, J.B. had picked up a male friend, W.W., who was 15 years old.

{¶ 5} One of the other juveniles, H.H., had dated Monahan for about a month in

the summer of 2016. Monahan had also lived at H.H.'s home for several months after they broke up. After Monahan left H.H.'s home, they did not get along for the most part.

{¶ 6} H.H. was friends with J.B. and W.W., as well as the fourth juvenile, D.P., a female who had been staying at H.H.'s house for a short period of time. At some point during the evening, J.B. picked up the girls and they all drove to Covington, Ohio, so that J.B. could sell his old cell phone. While they were in Covington, someone took a "selfie" of the four, and the photo was posted on Snapchat, which is a social media website. Because Monahan was friends with J.B. and H.H. on Snapchat, he saw the picture. As the group left Covington, Monahan sent H.H. a text message, which sparked an argument and a lot of conflict.

{¶ 7} As the four juveniles drove back to Greenville, Ohio, the conflict escalated. After one or two calls where W.W. answered H.H.'s phone, Monahan started. W.W. was also threatening Monahan and said he would blow something up if Monahan did not stop. Once the juveniles arrived back in Greenville, there were phone calls from random numbers as well as from Monahan, and J.B. or W.W. would answer the phone. There was more arguing. Both W.W. and J.B. made threats, and Monahan told them to come to his house.

{¶ 8} Everyone in the truck had been smoking marijuana, and J.B. and W.W. were also drinking alcohol. In addition, J.B. and W.W. had taken Xanax earlier in the day. Somewhere around 10:00 p.m., the group drove to Monahan's house. J.B. and W.W. admitted they were going to the house to fight Monahan and were looking for trouble.

{¶ 9} When they arrived, two of Monahan's younger brothers, who had been out riding bicycles, rode into the driveway ahead of the pickup truck. All the juveniles in the

truck testified that no one in the truck had any weapons. Monahan, however, had a .22 rifle and was standing somewhere in the yard, to the left of the house, where trees were. Monahan also owned a BB gun. One of Monahan's brothers testified that the people in the truck were shooting BBs at them.

{¶ 10} The juveniles could not see Monahan because it was dark outside. J.B. and W.W. got out of the truck and yelled at Monahan. Monahan told them to get off his property, and he fired a gun. The State's witnesses described various numbers of shots, ranging from several shots to 30. J.B. testified that he saw muzzle flashes but no one was hit; Monahan was just telling them to leave. D.P. indicated that Monahan appeared to be shooting at the ground.

{¶ 11} After the shooting began, J.B. and W.W. got back in the truck, and J.B. backed the truck up to leave. After quickly backing out of the driveway, J.B. drove north on St. Route 49, heading toward some softball fields. After traveling a short distance, J.B. heard a crack through the window and heard H.H. scream. H.H. was sitting in a jump seat on the passenger side of the truck. H.H. did not hear the glass breaking due to the loud music in the car, but she put her hands to her face and noticed she was bleeding. Like the other juveniles, H.H. testified that they were down the road from the house when she was hit. H.H. indicated that the truck was about a quarter of a mile from Monahan's house.

{¶ 12} J.B. immediately stopped the truck and called 911. Sergeant Shannon McDaniel of the Greenville Police Department received a dispatch at 10:16 p.m. about shots having been fired, and he was the first officer to arrive. McDaniel observed a red pickup truck at the side of the road, and four subjects around the vehicle. One of the

persons was H.H., who had a mark on the right side of her neck that was bleeding and an injury to her chin. H.H. was taken to the hospital, where she received treatment, including a CT scan of her neck and stitches to her chin.

{¶ 13} In the meantime, McDaniel had called for additional units and had begun to diagram the scene. Officer Lovett talked to the occupants of the truck, and Officer Boyer took photos of the scene. Ultimately, McDaniel and three other officers spoke with the Monahan family and received consent to search the property. At that time, Monahan escorted McDaniel into the house and showed him where the firearm was. Monahan pointed to a Mossberg AR style .22 rifle, which was in Monahan's bedroom. Monahan told McDaniel what had happened and did a walk-through outside. They walked to the northeast area of the yard, and Monahan said that he had fired several rounds into the ground, had fired a warning shot, and had fired one shot at the vehicle while it was sitting in the driveway.

{¶ 14} Because Monahan had said that J.B. got out of the truck with a BB gun and that J.B. and W.W. shot BBs at him, the police searched for a BB gun as well as other shell casings and BBs. Two officers searched the side ditches around the pickup truck, but did not find any guns. One .22 shell casing was found in Monahan's yard that night, northwest of the residence. Two BBs were located on a car in the driveway back by the garage, and two were found on the ground near the car.

{¶ 15} The next day, the police returned to Monahan's property and again received consent to search. They located another .22 shell casing in the yard. Using a metal detector, they also found a CB11 BB gun in a ditch on the border of the girls' softball property; the gun was not on Monahan's property. DNA testing of this BB gun revealed

that Monahan was the major contributor, with the DNA match being more rare than one in a trillion. One of Monahan's brothers was also matched as a contributor, based on a DNA statistic of one in 200,000. DNA had been taken from the four juveniles and the members of the Monahan family, but no DNA was identified on the BB gun other than that of Monahan and his brother.

{¶ 16} During the June 10, 2017 search, Monahan again talked to the police and did a walk-through. He said he had received some threatening messages from the four juveniles, which led him to obtain his .22 rifle and exit the north side of the house with his brother, S.M. At that point, Monahan saw a pickup truck pull into the driveway. According to Monahan, the two males were chasing his other two brothers, who had run into the house. Words were exchanged between the two males and Monahan, and he fired off a couple of warning shots to get them off the property.

{¶ 17} Monahan further stated that he believed J.B. had had a gun and had raised it, so he fired a hip shot towards the truck with his rifle. Shortly thereafter, J.B. and W.W. got back into the truck and left. Monahan did not say anything about anyone being in the bed of the truck. Furthermore, Monahan said that he shot at the truck when it was in the driveway, firing a hip shot and not aiming at anyone. He denied shooting at the truck while it was on the road, stating that he had no reason to do so because the juveniles had left his property.

{¶ 18} Subsequently, on June 15, 2017, the police received a call from an individual who found a different BB gun (a 1911 gun) in a ditch while he was mowing grass at the softball fields. The gun was located about 100 feet from the location where the police had found the other gun, and was in the area the police had walked the night

of the shooting. This BB gun contained a very low amount of DNA on the handled areas, and no DNA comparisons could be made.

{¶ 19} On July 28, 2017, an indictment was filed, charging Monahan with four counts of felonious assault, with firearm specifications, and one count of tampering with evidence. On August 1, 2017, the police again interviewed Monahan, who maintained the same story. At this point, the police had lab reports confirming what they had suspected, i.e., that the bullet had traveled from the outside into the truck. At first, Monahan said that was not possible. However, the more they talked, Monahan said "it was possible, that he had been kind of moving around. And then at one point, [Monahan] did admit that he shot the truck while it was driving up 49." Transcript of Proceedings ("Tr."), p. 431.

{¶ 20} At trial, Monahan presented testimony from two of his brothers, who gave conflicting statements. While both brothers testified that a red pickup truck was behind them when they went in the driveway, one brother (D.M.) testified that the occupants of the truck were shooting a BB gun at him and his brother, C.M. In contrast, C.M. did not mention anyone shooting at them. Instead, C.M. said that the pickup truck followed them into the driveway, and that when he got to the back of the driveway, Monahan and the people in the truck started yelling at each other. C.M. also said that he heard shots and yelling and stayed on the back porch of the house. Both brothers testified that they did not hear any shots after the pickup truck backed out.

{¶ 21} At trial, Monahan also presented testimony from an appointed expert witness. The expert, a former police officer, concluded, based on information about Monahan's location, laser testimony, and witness statements, that Monahan could not

have made a shot like the one suggested from the location where Monahan had been standing. Based on experimentation with a BB gun and a window, the expert further stated that, at some point, whether by an individual in the bed of the truck or running back to the truck, a BB was accidentally discharged through the window before the vehicle left the driveway.

{¶ 22} After hearing the testimony, the trial court found Monahan guilty of one count of aggravated assault and not guilty of the remaining charges. Monahan timely appealed from his conviction.


II. Ineffective Assistance of Trial Counsel

{¶ 23} Monahan's First Assignment of Error states that:

The Appellant Was Denied Effective Assistance of Counsel Due to

Trial Counsel's Failure to Qualify a Proper Expert for the Defense of

Impossibility and Due to the Failure to Argue Self-Defense.

{¶ 24} Under this assignment of error, Monahan makes two arguments. The first is that trial counsel was ineffective because he failed to qualify a proper expert for the defense of impossibility. Monahan's second point is that trial counsel should have argued self-defense.

{¶ 25} "Reversal of a conviction on the grounds of ineffective assistance of counsel requires a showing, first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense so as to deprive defendant of a fair trial." *State v. Treesh*, 90 Ohio St.3d 460, 489, 739 N.E.2d 749 (2001), citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "To show that

a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph three of the syllabus.

{¶ 26} Generally, the decision of trial counsel "whether to call a witness falls within the rubric of trial strategy and will not be second-guessed by a reviewing court." *Treesh* at 490. *Accord State v. Martin*, 2d Dist. Montgomery No. 20610, 2005-Ohio-1369, ¶ 19. Moreover, "[d]ebatable trial tactics generally do not constitute a deprivation of effective counsel." *State v. Phillips*, 74 Ohio St.3d 72, 85, 656 N.E.2d 643 (1995).

{¶ 27} At trial, the State presented testimony from Bureau of Criminal Investigation (BCI) experts in glass, firearms, and DNA. The sole contribution of the glass expert was to testify that the projectile that struck H.H. broke the window from the outside. This expert stated that she could not tell the angle at which the projectile entered the window, and that she did not perform other experiments.

{¶ 28} The firearms expert examined the .22 rifle and testified that it was operable and that the bullets that the expert fired from the rifle matched the shell casings found in the yard. Finally, the DNA expert testified, as noted above, about the DNA found on one of the BB guns.

{¶ 29} The defense was given money for an appointed expert, who visited the scene and conducted an experiment with a BB gun and glass from a truck like the one that was involved. This expert, John Schmidt, had been a police officer between 1978 and 1994, had worked at the Adult Probation Department for about six years, and had then served briefly as the Greenville Safety Service Director. During his tenure as a

police officer, Schmidt was on road patrol, was an evidence technician, and was a property room manager.

**{¶ 30}** During the State's voir dire, Schmidt indicated that he had not testified as an expert in firearms or BB guns, and that he was not certified in trace evidence, glass, firearms, fingerprints, or DNA, and had no training in physics. The trial court ruled that Schmidt could not comment on the quality of the BCI investigations, but could discuss deficiencies in the State's investigation due to his former experience as a detective. In addition, the court said that Schmidt could discuss what he did, which included a reenactment of the incident.

**{¶ 31}** During his testimony, Schmidt criticized the State's handling of some evidence, including the fact that the police had placed a rod through the bullet hole in the glass before sending the glass to the BCI. Schmidt also testified about his measurements and reenactment at the scene and he concluded that Monahan had not been in position to fire the shot that hit the window. Based on these observations and the presence of a BB under the driver's side floor-mat in the truck, Schmidt investigated the possibility that a BB, rather than a .22 bullet, struck the window of the truck. Schmidt was able to reproduce a hole in a similar window at a close range, and concluded that a BB accidently came through the window and struck H.H. while the truck was still in the driveway. The BB either came from someone who was in the bed of the truck (parts of which Schmidt found clean, indicating that someone had been in the truck bed), or accidentally as J.B. and W.W. were running back to the truck.

**{¶ 32}** The fact that Schmidt was not qualified to testify about the BCI investigations is irrelevant. The only pertinent evidence from the glass examiner was

that the hole in the window indicated that the projectile came from outside the truck. However, this was never disputed, i.e., there was no indication from anyone, including Monahan and his brothers, that anyone fired a BB gun inside the truck. As a result, there would have been no reason to hire an expert to attack that finding.

{¶ 33} The remaining BCI testimony (about DNA and operability of the rifle) was also basically irrelevant to the issue of how H.H. sustained an injury. Monahan never disputed firing a .22 rifle the night of the incident. Furthermore, the DNA testimony was presented to support the State's contention that Monahan tampered with evidence after the police left, by putting his own BB gun in the area where the truck had been parked. However, the trial court found Monahan not guilty of that charge. Accordingly, we see no basis for concluding that trial counsel was ineffective with respect to the expert witness. Given that Monahan admitted firing the gun when the truck was on the public roadway, his expert witness had a difficult task.

{¶ 34} Monahan's second argument is based on trial counsel's failure to argue self-defense rather than impossibility. "Self-defense represents more than a 'denial or contradiction of evidence which the prosecution has offered as proof of an essential element of the crime charged * * *.' Rather, * * * this defense admits the facts claimed by the prosecution and then relies on independent facts or circumstances which the defendant claims exempt him from liability." *State v. Martin*, 21 Ohio St.3d 91, 94, 488 N.E.2d 166 (1986), quoting *State v. Poole*, 33 Ohio St.2d 18, 19, 294 N.E.2d 888 (1973).

{¶ 35} "Self-defense is an affirmative defense that requires a defendant to prove three elements by a preponderance of the evidence: '(1) the defendant was not at fault in creating the violent situation, (2) the defendant had a bona fide belief that [he or] she was

in imminent danger of death or great bodily harm and that [the] only means of escape was the use of force, and (3) that the defendant did not violate any duty to retreat or avoid the danger.' " *State v. Goff*, 128 Ohio St.3d 169, 2010-Ohio-6317, 942 N.E.2d 1075, ¶ 36, quoting *State v. Thomas*, 77 Ohio St.3d 323, 326, 673 N.E.2d 1339 (1997).

**{¶ 36}** Given Monahan's admission of having shot toward the truck after it left his property, he could not have prevailed on the contention that he was in imminent danger of death or great bodily harm and that his only means of escape was the use of force. Furthermore, even if one disregards Monahan's own admission, the facts he presented did not indicate that he was in imminent danger of death or great bodily harm or, more importantly, that he could not have retreated into his home and simply called the police.

**{¶ 37}** In arguing that he had the right to shoot at the truck, Monahan stresses the fact that he told investigators that he believed J.B. had a gun. The testimony in this regard was that Monahan said someone (a person he did not specifically identify) had a black object that he thought looked like a gun. As a result, Monahan raised his weapon and fired at "them" (presumably J.B. and W.W., as there was no evidence that the girls left the truck).

**{¶ 38}** However, the evidence indicates that Monahan initiated the incident by texting H.H. after seeing a picture on Snapchat. Monahan then continued to engage in an escalating argument, even though he could have stopped at any time. Consequently, even though J.B. and W.W. were also at fault, Monahan, himself, was not without fault in creating the violent situation.

**{¶ 39}** Monahan also knew ahead of time that the juveniles were coming to his property. Instead of staying inside and simply calling the police, if he indeed thought he

had been threatened, Monahan chose to stand outside with a gun. The use of force, therefore, was not the only means of escape.

{¶ 40} The Supreme Court of Ohio has stressed that "the elements of self-defense are cumulative. * * * If the defendant fails to prove *any one* of these elements by a preponderance of the evidence he has failed to demonstrate that he acted in self-defense." (Emphasis sic.) *State v. Jackson*, 22 Ohio St.3d 281, 284, 490 N.E.2d 893 (1986). Because Monahan failed to establish either of the first two elements of the test for self-defense, his trial counsel did not render ineffective assistance by failing to argue this as an affirmative defense.

{¶ 41} Finally, even though there is no duty to retreat from inside a residence and a presumption of self-defense applies if individuals are attempting to expel others from their homes, the juveniles did not enter Monahan's home; they were outside on the driveway. *See State v. Hubbard*, 10th Dist. Franklin No. 11AP-945, 2013-Ohio-2735, ¶ 52-55 (defendant was not entitled to self-defense instruction or presumption of self-defense where he fired a gun into a crowd that was in his yard, as there was no evidence that anyone tried to unlawfully enter onto his porch, which is part of a residence under R.C. 2901.05(D)(2)); *State v. El-Hardan*, 2d Dist. Montgomery No. 24293, 2011-Ohio-4453, ¶ 15 (the Castle doctrine, as codified in R.C. 2901.05, narrowly applies "the doctrine to the interior of one's residence or dwelling"). *See also* R.C. 2901.09(B) and R.C. 2901.05(B)(1).

{¶ 42} Based on the preceding discussion, Monahan's trial counsel did not render ineffective assistance by failing to argue self-defense or in presenting expert testimony. Accordingly, the First Assignment of Error is overruled.

### III.   Manifest Weight Challenge

**{¶ 43}** Monahan's Second Assignment of Error states that:

The Trial Court's Verdict Was Against the Manifest Weight of the Evidence and Should Be Vacated.

**{¶ 44}** Under this assignment of error, Monahan contends that his conviction for aggravated assault was against the manifest weight of the evidence because the evidence did not indicate that he acted under a sudden fit of passion or rage as required by R.C. 2903.12.

**{¶ 45}** In situations involving a manifest weight challenge, an appellate court reviews " 'the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.   The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' "   *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).   "The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence."   *State v. Adams*, 2d Dist. Greene No. 2013-CA-61, 2014-Ohio-3432, ¶ 24, citing *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 14.

**{¶ 46}** The principle of cautiously exercising this discretionary power is due to the fact that a jury or trial court sees and hears the witnesses and has unique competence to

decide whether, and to what extent, to credit their testimony. As a result, we accord substantial deference to the credibility decisions of factfinders. *See State v. Winbush*, 2017-Ohio-696, 85 N.E.3d 501, ¶ 59 (2d Dist.), citing *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997). Furthermore, "the law presumes that in a bench trial the court considers only relevant, material, and competent evidence." *State v. Bays*, 87 Ohio St.3d 15, 27, 716 N.E.2d 1126 (1999).

**{¶ 47}** Monahan was indicted on charges of felonious assault, but the trial court found him guilty of aggravated assault, which is an " 'inferior degree' of the indicted offense" because its elements are identical to the elements of felonious assault, "except for the additional mitigating element of serious provocation." *State v. Deem*, 40 Ohio St.3d 205, 206, 533 N.E.2d 294 (1988), paragraphs two and four of the syllabus.

**{¶ 48}** For provocation to be serious, it "must be reasonably sufficient to bring on extreme stress and the provocation must be reasonably sufficient to incite or to arouse the defendant into using deadly force. In determining whether the provocation was reasonably sufficient to incite the defendant into using deadly force, the court must consider the emotional and mental state of the defendant and the conditions and circumstances that surrounded him at the time." *Id.* at paragraph five of the syllabus.

**{¶ 49}** A two-part analysis is used to decide whether provocation is reasonably sufficient. An objective standard is first used, in which the provocation "must be sufficient to arouse an ordinary person's passion beyond the power of his or her control." *State v. Shane*, 63 Ohio St.3d 630, 634-635, 590 N.E.2d 272 (1992). After the objective standard has been met, a subjective standard applies for purposes of deciding if the particular defendant "actually was under the influence of sudden passion or in a sudden fit of rage."

*Id.* at 634. *Accord State v. Mack*, 82 Ohio St.3d 198, 201, 694 N.E.2d 1328 (1998); *State v. Harding*, 2d Dist. Montgomery No. 24062, 2011-Ohio-2823, ¶ 42.

{¶ 50} The shooting in this case occurred after an escalating argument among teenagers, during which threats were made that W.W. intended to blow up something. J.B. also testified that Monahan probably thought they were coming to do damage to him. Tr. at p. 217. If one believes the testimony of Monahan's brother, either J.B. or W.W. shot BBs at Monahan's brothers as they entered the driveway. In addition, Monahan told the police that evening that W.W. had threatened to blow up the residence, that he heard his brothers screaming, and that he fired shots after running out the front door with his .22 rifle. Monahan did not tell the police that he was afraid; on the night of the shooting, he said that the only thing he was under the influence of was anger. *Id.* at 400.

{¶ 51} While Monahan gave a number of conflicting accounts, we conclude that under the circumstances, both objective and subjective (based on Monahan's own statements), the trial court's judgment that Monahan was guilty of aggravated assault was not against the manifest weight of the evidence. *Compare State v. Roberts*, 8th Dist. Cuyahoga No. 90998, 2009-Ohio-1605, ¶ 23 (sufficient evidence existed to support aggravated assault conviction where prior to shooting incident, defendant and victim disagreed over a girl, which escalated into argument and fistfight. After the fight stopped, the defendant retrieved a gun and fired it into the victim's car, but not at the victim).

{¶ 52} Finally, as the State notes, when cases are tried to the bench, " 'the court is presumed to know the law and [to] have considered any lesser offenses that [were] supported by the evidence.' " (Citations omitted.) *State v. Lynch*, 2d Dist. Montgomery No. 27620, 2018-Ohio-1424, ¶ 23, quoting *State v. Henderson*, 6th Dist. Wood No. WD-

16-012, 2017-Ohio-2900, ¶ 28.

{¶ 53} Based on the preceding discussion, the Second Assignment of Error is overruled.

IV. Motion to Withdraw as Defense Counsel

{¶ 54} Monahan's Third Assignment of Error states that:

The Trial Court Erred by Denying the Motion to Withdraw of Defendant's Trial Counsel.

{¶ 55} Under this assignment of error, Monahan contends that the trial court abused its discretion by denying his counsel's motion to withdraw and to continue the trial to let Monahan seek new counsel. According to Monahan, the motion indicated that there was a breakdown in the attorney-client relationship. In addition, Monahan argues that the court's comments about the management of its docket were troubling, given Monahan's willingness to waive his speedy trial rights.

{¶ 56} Indigent defendants are not entitled to attorneys of their choice at state expense; instead, they are entitled to "competent, effective representation" from the lawyer that the court appoints. *State v. Williams*, 2d Dist. Montgomery No. 24548, 2012-Ohio-4179, ¶ 25, citing *State v. Gordon*, 149 Ohio App.3d 237, 2002-Ohio-2761, 776 N.E.2d 1135, ¶ 11 (1st Dist.). "To discharge a court-appointed attorney, the defendant must show a breakdown in the attorney-client relationship of such magnitude as to jeopardize the defendant's right to effective assistance of counsel." *State v. Coleman*, 37 Ohio St. 3d 286, 287, 525 N.E.2d 792 (1988), paragraph four of the syllabus. We review the trial court's decision for abuse of discretion. *State v. Williams*, 99 Ohio St.3d

493, 2003-Ohio-4396, 794 N.E.2d 27, ¶ 135.

{¶ 57} " 'Abuse of discretion' has been defined as an attitude that is unreasonable, arbitrary or unconscionable." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990). Most abuses of discretion "result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary." *Id.* Decisions are unreasonable when they are not supported by a sound reasoning process. "It is not enough that the reviewing court, were it deciding the issue *de novo*, would not have found that reasoning process to be persuasive, perhaps in view of countervailing reasoning processes that would support a contrary result." *Id.*

{¶ 58} We have also said that substitution of counsel is not warranted due to disagreements about trial strategy or tactics. Furthermore, "mere hostility, tension and personal conflicts between attorney and client do not constitute a total breakdown in communication if those problems do not interfere with the preparation and presentation of a defense." *State v. Furlow*, 2d Dist. Clark No. 03CA0058, 2004-Ohio-5279, ¶ 12, citing *Gordon* at ¶ 12.

{¶ 59} As was noted, the indictment in this case was filed in late July 2017, and the trial court appointed counsel for Monahan on August 3, 2017. The same day, appointed counsel filed a motion to withdraw because he had previously been retained to represent one of the alleged victims, J.B., in a case in the Darke County Juvenile Court. On August 4, 2017, the trial court granted the motion and appointed David Rohrer as counsel for Monahan.

{¶ 60} Trial was originally scheduled to begin on October 24, 2017. However, the

day before trial, Monahan filed a motion for a competency evaluation. After holding a hearing, the court denied the motion on October 26, 2017. The court then set the matter for a jury trial to begin on January 23, 2018.

{¶ 61} On January 18, 2018, Rohrer filed a motion for leave to withdraw as counsel. Rohrer indicated that trust had been "irrevocably broken" between counsel and Monahan, as well as Monahan's family, and that Monahan had "pursued" new counsel to represent him. Rohrer also stated that Monahan was willing to waive his speedy trial rights to obtain a continuance and substitution of counsel. The trial court overruled the motion the same day, noting that Monahan's counsel had filed appropriate motions and had conducted expected trial discovery and preparation.

{¶ 62} Furthermore, the court found the motion to be dilatory in view of the pre-trial scheduling, and it stated that the court owed a duty to parties, counsel, the victims, and the public to keep its docket moving. On the first day of trial (which was a bench trial), defense counsel renewed his request to withdraw, but stressed that he was prepared to go forward. At that point, the court reiterated its concerns about the delay in making the request. The court also commented that trial counsel had an existing relationship with the appointed expert that might affect any new counsel. Finally, the court noted that defense counsel had done everything the court expected of counsel to prepare for trial. Tr. at pp. 7-8.

{¶ 63} We cannot find that the trial court acted arbitrarily, unconscionably or unreasonably. No specific information was given to the trial court other than the allegation of a breakdown in the relationship and the fact that Monahan's mother had pursued other counsel. Monahan did not allege at trial or prior to trial that his trial counsel

had failed to properly prepare, and the timing of the request to withdraw shortly before the second scheduled trial raised an inference that it was made for purposes of delay. This inference was particularly strong in view of the motion that was filed one day before the prior scheduled trial, which forced a continuance. *See State v. Ahmed*, 103 Ohio St.3d 27, 2004-Ohio-4190, 813 N.E.2d 637, ¶ 33, quoting *Smith v. Lockhart*, 923 F.2d 1314, 1321, fn.11 (8th Cir.1991) ("courts 'must be wary of defendants who employ complaints about counsel as dilatory tactics or for another invidious motive' ").

{¶ 64} We additionally note that trial counsel said he was prepared for trial. In fact, counsel was able to successfully obtain a judgment of not guilty on four second-degree felonies with four firearm specifications and on one third-degree felony. The end result was that Monahan was convicted only of one fourth-degree felony and faced a substantially shorter potential prison sentence. Monahan also did not blame his counsel when the judge rendered the verdict or during the sentencing hearing, nor did he ask the trial court for new counsel to represent him at the sentencing hearing. *Compare State v. Pillow*, 2d Dist. Greene No. 07CA095, 2008-Ohio-6046, ¶ 140 (trial court did not abuse its discretion by failing to appoint new counsel for the sentencing hearing, even when defendant blamed his counsel for the jury verdict against him).

{¶ 65} Based on the preceding discussion, the Third Assignment of Error is overruled.

V. Conclusion

{¶ 66} All of Monahan's assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

DONOVAN, J. and TUCKER, J., concur.

Copies sent to:

James D. Bennett
Jose M. Lopez
Hon. Jonathan P. Hein