[Cite as *State v. Washington*, 2022-Ohio-1426.]

## IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## MIAMI COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 2020-CA-18 |
| | : | |
| v. | : | Trial Court Case No. 2019-CR-374 |
| | : | |
| JE-TARRE A. WASHINGTON | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

## O P I N I O N

Rendered on the 29th day of April, 2022.

. . . . . . . . . . .

PAUL M. WATKINS, Atty. Reg. No. 0090868, Assistant Prosecuting Attorney, Miami County Prosecutor's Office, Appellate Division, Safety Building, 201 West Main Street, Troy, Ohio 45373

 Attorney for Plaintiff-Appellee

KYLE J. LENNEN, Atty. Reg. No. 0085726, 120 West Second Street, Suite 820, Dayton, Ohio 45402

 Attorney for Defendant-Appellant

. . . . . . . . . . . . .

EPLEY, J.

{¶ 1} Je-Tarre A. Washington was found guilty after a jury trial in the Miami County Court of Common Pleas of two counts of having weapons while under disability and one count each of aggravated burglary, aggravated robbery, felonious assault, abduction, burglary (with a gun specification), receiving stolen property (with a gun specification), failure to comply with an order or signal of a police officer (with a gun specification), and possession of cocaine. The trial court imposed an aggregate sentence of a minimum of 24 years and a maximum of 28 years in prison, suspended Washington's driver's license for 25 years, and ordered him to pay court costs totaling $11,520. The court found Washington to be a repeat violent offender, but it did not impose an additional penalty. For the following reasons, the trial court's judgment will be affirmed.

## I. Facts and Procedural History

{¶ 2} Washington's convictions stem from a series of incidents on June 24-25, 2019, in Miami County. The State's evidence at trial established the following facts.

*Theft of Jeep Cherokee*

In the early afternoon of June 24, David Hecker drove his girlfriend's blue 2002 Jeep Cherokee to the residence of Christopher Reedy near the old Piqua Motel on North County Road 25A in Piqua. Hecker intended to pick up Reedy and drive him to a different location to purchase drugs, but when Hecker arrived, he found Reedy to be incapacitated from drug use already. Washington, who was known as "T," was at Reedy's residence and asked Hecker for a ride to Cashland. Washington offered $10 as gas money. Hecker agreed. Washington and Hecker assisted Reedy to the Jeep

and placed him in the back seat. Washington then placed several items in the Jeep and sat in the front passenger seat.

{¶ 3} Shortly after leaving Reedy's residence, at approximately 12:20 p.m., Hecker stopped at the nearby Sunoco gas station to purchase fuel. Hecker alone exited the vehicle. When he went into the Sunoco to pay for the gas, the Jeep drove off without him. At that time, the Jeep had a permanent license plate, and the title and registration, which had been issued to Holly Cantrell (Hecker's girlfriend), were in the glove compartment. Hecker called 911 and reported the Jeep as stolen. Hecker identified Reedy and "T" as suspects to Officer Joshua May, the responding police officer. (In his 911 call, Hecker identified Reedy as the driver, but at trial, he testified that he had been mistaken.) Hecker provided a physical description of "T," which matched Washington.

{¶ 4} Officer May continued the investigation of the stolen Jeep. In the morning of June 25, he received information that the Jeep might be at the apartments by the old Piqua Motel. May responded to the apartments but did not see the Jeep. Officer May returned around noon on a complaint by Reedy of a disturbance; Reedy allegedly was having an argument with a male across the street. May searched the area but did not locate Reedy or the other male. During the day, Cantrell informed Officer May that a family member had identified "T" as Washington.

*Incident at David Beard's Residence*

{¶ 5} At approximately 7:15 a.m. on June 25, David Beard returned to his apartment on Hilltop Circle in Troy after completing his 11 p.m. to 7 a.m. shift at work. When he arrived home, he saw a Jeep Cherokee parked in his usual parking spot outside

his apartment. Beard climbed the stairs leading to a deck at the rear of his second-story apartment and noticed that a window screen had been raised. He assumed that his estranged wife, Shannon Yohey, was in his apartment. Beard testified that his relationship with Yohey had deteriorated because she was addicted to heroin, and they had used separate bedrooms prior to her moving out.

{¶ 6} Beard entered the apartment and walked down the hallway toward the two bedrooms. While in the hallway, he was assaulted by Washington, who came out of the bedroom Yohey had used. Although Washington's face was masked from his nose down, Washington was an acquaintance of Yohey, and Beard recognized him from his voice and mannerisms, as well as a decorative script tattoo above his eye. Beard was hit repeatedly on the head. When Beard resisted, another man called Diego, whom Beard did not recognize, punched him in the face. A third person, a woman called "Shorty," was present but did not participate in the assault.

{¶ 7} After Beard ceased resisting, he was taken to the living room and forced to kneel with his face on his couch. He repeatedly was asked, "Where is it?" Beard did not know what they were looking for. Washington told Shorty to bind Beard's ankles and wrists with masking tape, and Beard was hit in the head with a clay pot from his television stand. The group took several items from Beard's person and apartment (a $20 bill, a cell phone, car keys, a television, and other items) and stole Beard's gray Chevy Cobalt from the parking lot.

{¶ 8} Beard contacted the police and was transported by ambulance to the hospital, where he was treated for several lacerations to his head and face and then taken

to a plastic surgeon, who repaired an extensive laceration to his ear. While at the hospital, Beard spoke with Detective Chris Baker and Detective Captain Jeff Kunkleman of the Troy Police Department. Beard initially reported that he had been carjacked; then he indicated that the assault had occurred on the steps to his apartment. Upon further questioning, Beard ultimately told the detectives that the assault occurred within his apartment. With Beard's consent, Troy officers searched Beard's apartment, where masking tape, a broken pot, blood, and other evidence was located. Yohey's bedroom showed signs of drug use.

*Incident at Harry Milby's Residence*

{¶ 9} Between 11:30 a.m. and 2:30 p.m. on June 25, the home of Harry Milby on North Piqua-Lockington Road in Springcreek Township was burglarized. The stolen items included (1) a large, very heavy gun safe containing seven firearms and several rounds of ammunition from the master bathroom closet, (2) Milby's chainsaw, crossbow, and drill from the detached garage, (3) a Ruger 10/22 rifle with a scope from behind the dresser in the master bedroom, (4) the hard drive for Milby's security system from a computer desk in the kitchen/dinette area, and (5) ear protection.

{¶ 10} Milby was at work when the burglary occurred. According to Milby, when he left for work, Andrea Fergerson, who did cleaning and gardening for him and sometimes stayed overnight at his home, was there. Fergerson testified that her boyfriend, Simuel Hummins (aka Neal, 6, or 600) also was there, and they left Milby's residence at around 11:30 a.m.; her mother, Rosalind Fergerson, had picked them up. Fergerson said that she first went to purchase drugs from Washington at a residence near

Downing Street in Piqua. Fergerson's mother returned Fergerson to Milby's home around 2:45 p.m. Sometime after 3:00 p.m., Fergerson noticed that items in the house had been disturbed. She contacted Milby, who told her to call the police.

{¶ 11} Miami County Deputy Joseph Martin responded to Milby's home. As part of his investigation, he collected fingerprints from a dolly in Milby's garage, which Milby thought could have been used to move the safe; the dolly had been inside the home when Milby left for work, and tire tracks led from the back door to the detached garage. Analysis by the Miami Valley Regional Crime Lab later determined that one of the fingerprints on the dolly came from Washington's right middle finger. Milby testified that he did not know Washington, but Fergerson testified that the night before the burglary, Washington had come to Milby's driveway to sell her drugs.

*Investigation of Vehicles and Apprehension of Washington*

{¶ 12} During the afternoon of June 25, Troy Detective Baker and Detective Captain Kunkleman went to Piqua to search for Beard's stolen Chevy Cobalt. As part of their search, they looked on North County Road 25A near where the Jeep Cherokee had been stolen the day before. The Troy detectives located Beard's Cobalt in the parking lot of Reedy's apartment complex by the old Piqua Motel. The Cobalt had a temporary tag, but the detectives confirmed that the car was Beard's by its vehicle identification number. The Troy detectives contacted the Piqua police, and Piqua Officers May and Weber responded to the scene. At that time, Officer May learned that Washington was a suspect in the Troy investigation. With the agreement of the Piqua officers, the Troy detectives had the Cobalt towed to their police department for processing.

{¶ 13} While at the old Piqua Motel, the officers noticed a blue Jeep Cherokee matching the description of the stolen Jeep drive by. The driver matched Washington's description, and Detective Captain Kunkleman (Troy PD) and Officer Weber (Piqua PD) recognized the driver as Washington. Officer Weber, who was seated in his cruiser, activated his overhead lights and siren and drove after the Jeep to stop it. The Troy detectives followed in their unmarked vehicle with lights and siren also activated. Officer May, whose cruiser was parked farther away, ran to his cruiser and also pursued. A high-speed chase ensued, which ended when the Jeep, driven by Washington, crashed into a trailer hitched to a pick-up truck that was waiting to turn onto North County Road 25A from the exit ramp of northbound Interstate 75. Washington fled on foot but was quickly apprehended and informed of his *Miranda* rights. Officers located a $20 bill, a cell phone, and a pen barrel with white residue on Washington's person.

{¶ 14} Because Washington complained of not being able to breath, officers called for an ambulance. During the drive to the hospital, Washington told Kunkleman that he wanted to cooperate, to which Kunkelman responded that Washington would have to establish some trust by telling him who was with Washington at Beard's apartment that morning. Washington responded that he would talk off-the-record. When Kunkleman stated that nothing could be off-the-record, Washington declined to speak. After several hours at the hospital, Washington was discharged and transported to jail.

{¶ 15} Officer Weber returned to the crash scene after Washington was in custody. He looked in the Jeep to ensure that no one else was inside who might be injured. Upon peering in the open driver's door of the Jeep, he saw a pipe used to smoke cocaine, a

baggie with white residue that appeared to be some type of cocaine or rock cocaine, and fake money on the floorboard. Weber stated that the vehicle was "packed" with property, including a large gun safe, and items appeared to have been thrown forward in the crash. The butt of a gun was protruding from the center console, which was broken. For safety reasons, Weber took the revolver from the console and placed it in his cruiser. Officer Weber ran the registration for the Jeep and learned that the temporary tag had been issued to Khalid Owings, Washington's nephew. Weber later spoke with Owings, who never claimed ownership of the Jeep.

*Continued Investigation*

{¶ 16} Additional examination of the Jeep confirmed that the vehicle was the one reported stolen by Hecker and registered to Cantrell, although the Jeep had a temporary tag rather than a permanent license plate. In the vehicle, officers located Milby's unopened gun safe, Ruger 10/22 rifle, crossbow, chainsaw, and other items belonging to Milby. The Jeep also contained, among other items, Beard's medical insurance card, a television from Beard's apartment, and a Michael Kors purse belonging to Yohey, Beard's wife.

{¶ 17} Detective Nate Jessup of the Miami County Sheriff's Office was assigned to conduct a follow-up investigation of the Milby burglary. Detective Jessup showed photographs of the items recovered from the Jeep to Milby, who identified several items as his. Milby provided keys to his gun safe, which were used to open the gun safe recovered from the Jeep. Detective Jessup interviewed Fergerson on August 27, 2019. He testified that there was no evidence that Fergerson was involved in the burglary of

Milby's home.

{¶ 18} Detective Jessup took possession the cell phone recovered from Washington. Although he obtained a search warrant for the phone, he initially could not access its contents because the phone was password-protected. During a recorded telephone conversation on September 14, 2020, Washington provided the password for a previous phone to his girlfriend. Detective Jessup tried that password on the cell phone for which he had a search warrant and found that it unlocked the phone. The phone contained a photo of Washington holding a revolver that looked the same as the gun found in the Jeep's console.

{¶ 19} The call log from Washington's cell phone showed that he had made and received numerous phone calls during the overnight hours on June 24-25, 2019. A health application on the phone included a step counter and information about flights of stairs climbed. A report from the app showed that the phone repeatedly was in motion during the overnight hours, and the phone had climbed one flight of stairs at 5:14 a.m. on June 25, 2019.

{¶ 20} Firearm experts test-fired the two guns found in the Jeep: the Ruger 22-caliber carbine model 10/22 rifle and the Model 10 .38 Special black revolver with a wooden handle. Both were operable. In addition, the Piqua Police Department sent the suspected drugs to the Miami Valley Regional Crime Lab for analysis. The substance was determined to be 2.10 grams +/- .02 grams of cocaine, a Schedule II controlled substance. Cantrell and Hecker both testified that they did not have firearms or illegal drugs in the Jeep.

{¶ 21} At the time of the offenses, Washington had two prior convictions: (1) a 2010 conviction in Clark County for felonious assault, Clark C.P. No. 2009-CR-988, and (2) a 2019 conviction in Montgomery County for aggravated possession of drugs, Montgomery C.P. No. 2018-CR-4639/1. Detective Baker testified that on November 9, 2020 (the first day of trial), he heard Washington tell the trial court that he was guilty of failure to comply, but "that's all I'm guilty for."

*Procedural History*

{¶ 22} Washington initially was charged in Miami County Municipal Court, and upon being bound over to common pleas court, the offenses were separated into five cases: Miami C.P. Nos. 2019-CR-374 to 2019-CR-378. On August 13, 2019, a grand jury indicted Washington in an eight-count indictment for aggravated burglary, aggravated robbery, felonious assault, abduction, burglary, failure to comply with an order or signal of a police officer, possession of cocaine, and having weapons while under disability. The indictment was filed under Case No. 2019-CR-374, and the additional four cases were dismissed. A superseding indictment, filed in September 2019, added a charge of receiving stolen property (motor vehicle), an additional count of having weapons while under disability, three firearm specifications, and a repeat violent offender specification.

{¶ 23} Washington filed numerous motions during the pendency of his case. Of relevance to this appeal, in September 2019, he filed separate motions to suppress and for separate trials (to sever the offenses). The trial court conducted a hearing on the motion to suppress on October 17, 2019. The following month, it denied the motion to suppress as well as the motion for separate trials. Washington sought reconsideration

of the denial of his motion for separate trials, but that request was denied.

{¶ 24} On March 23, 2020, Washington moved for the appointment of co-counsel. Four days later, he withdrew the motion, but the trial court nevertheless appointed the co-counsel that had been requested. Throughout the pendency of his case, Washington also brought multiple motions to dismiss on speedy trial grounds. The court denied each of them.

{¶ 25} On August 19, 2020, Washington escaped from custody while he was on a medical furlough. It is undisputed that he was arrested in Oklahoma on September 3, waived extradition on September 4, and returned to Miami County on September 7. The trial court rescheduled the jury trial for September 15, 2020. However, on that date, Washington engaged in disruptive behavior and misbehavior in the presence of jurors. Consequently, the trial court dismissed the jury and set a new trial date.

{¶ 26} On three occasions following Washington's return from Oklahoma, his primary defense counsel moved to withdraw; co-counsel did not join the motions. The last of these motions was made orally on the morning of the November 9, 2020 trial date. Each motion was denied.

{¶ 27} The matter proceeded to a jury trial on November 9, 2020. During the trial, the State presented 30 witnesses in its case-in-chief, as well as two witnesses in rebuttal. Washington testified on his own behalf and presented two other witnesses. After deliberations, the jury found Washington guilty of all counts and specifications.

{¶ 28} At sentencing, the trial court determined that none of the offenses or firearm specifications merged for sentencing, and it imposed a combination of consecutive and

concurrent sentences totaling a minimum of 24 years to a maximum of 28 years in prison. The court found that Washington was a repeat violent offender, but it imposed no additional penalty. The court suspended Washington's driver's license for 25 years and ordered him to pay court costs of $11,520.

{¶ 29} Washington appeals from his convictions, raising nine assignments of error. We will address them in an order that facilitates our analysis.

## II. Motion to Suppress

{¶ 30} In his sixth assignment of error, Washington claims that the trial court erred in denying his motion to suppress.

{¶ 31} An appeal from a ruling on a motion to suppress presents a mixed question of fact and law. *State v. Ojezua*, 2016-Ohio-2659, 50 N.E.3d 14, ¶ 15 (2d Dist.). When considering a motion to suppress, the trial court takes on the role of trier of fact and is in the best position to resolve factual questions and assess the credibility of witnesses. *State v. Turner*, 2015-Ohio-4612, 48 N.E.3d 981, ¶ 10 (2d Dist.). As a result, we must accept the trial court's findings of fact if they are supported by competent and credible evidence. *Id.* "Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Id.*, quoting *State v. Koon*, 2d Dist. Montgomery No. 26296, 2015-Ohio-1326, ¶ 13. The trial court's application of law to the findings of fact is subject to a de novo standard of review. *State v. Shepherd*, 2d Dist. Montgomery No. 29123, 2021-Ohio-4230, ¶ 10.

{¶ 32} In his motion, Washington sought the suppression of all evidence obtained

as a result of the stop of the Jeep, including items located within the vehicle and any statements he made following his apprehension. He claimed that the officers lacked probable cause to stop and search the Jeep and that his statements were obtained contrary to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and were involuntary. Prior to the suppression hearing, defense counsel informed the trial court that the only issue to be addressed at the hearing was Washington's alleged statement.

**{¶ 33}** Under the Fifth Amendment to the United States Constitution, no person shall be compelled to be a witness against himself or herself. To ensure that this constitutional right is protected, statements resulting from custodial interrogations are admissible only after a showing that the procedural safeguards described in *Miranda* have been followed. *State v. Earnest*, 2d Dist. Montgomery No. 26646, 2015-Ohio-3913, ¶ 21. *Miranda* held that prior to questioning, a suspect "must be warned that he [or she] has a right to remain silent, that any statement he [or she] does make may be used as evidence against him [or her], and that he [or she] has a right to the presence of an attorney, either retained or appointed." *In re M.H.*, 163 Ohio St.3d 93, 2020-Ohio-5485, 168 N.E.3d 439, ¶ 18, quoting *Miranda* at 444. Custodial interrogation occurs when an officer, by words or action, seeks information from a suspect that he knows is reasonably likely to be incriminating. *Rhode Island v. Innis*, 446 U.S. 291, 300-301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980); *State v. Thompson-Shabazz*, 2017-Ohio-7434, 96 N.E.3d 1146, ¶ 17 (2d Dist.).

**{¶ 34}** But "[p]olice officers are not responsible for unforeseeable incriminating

responses." *State v. Waggoner*, 2d Dist. Montgomery No. 21245, 2006-Ohio-844, ¶ 14; *State v. Strozier*, 172 Ohio App.3d 780, 2007-Ohio-4575, 876 N.E.2d 1304, ¶ 20 (2d Dist.). "A suspect who volunteers information, and who is not even asked any questions, is not subject to a custodial interrogation and is not entitled to *Miranda* warnings." *State v. Fair*, 2d Dist. Montgomery 24120, 2011-Ohio-3330, ¶ 39.

{¶ 35} A suspect may effectively waive his or her *Miranda* rights only if the waiver is made voluntarily, knowingly, and intelligently. *State v. Dailey*, 53 Ohio St.3d 88, 91, 559 N.E.2d 459 (1990), citing *Miranda* at 444. The waiver of *Miranda* rights is valid only if (1) the waiver was "the product of a free and deliberate choice rather than intimidation, coercion, or deception[,]" and (2) the person had "a full awareness of both the nature of the right[s] being abandoned and the consequences of the decision to abandon [them]." *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986); *State v. Marejka*, 2d Dist. Montgomery No. 27662, 2018-Ohio-2570, ¶ 14. Courts examine the totality of the circumstances to determine whether a suspect has knowingly, intelligently, and voluntarily waived his or her *Miranda* rights. *State v. Clark*, 38 Ohio St.3d 252, 261, 527 N.E.2d 844 (1988); *State v. White*, 2018-Ohio-3076, 118 N.E.3d 410, ¶ 17 (2d Dist.).

{¶ 36} No express written or oral waiver of *Miranda* rights is required. *North Carolina v. Butler*, 441 U.S. 369, 373, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979); *State v. Dillon*, 2016-Ohio-1561, 63 N.E.3d 712, ¶ 59 (2d Dist). "Instead, waiver can be inferred where a defendant proceeds to speak after being advised of his rights and indicating an understanding of them." *Dillon* at ¶ 59; *see Berghuis v. Thompkins*, 560 U.S. 370, 388-389, 130 S.Ct. 2250, 176 L.Ed.2d 1098 (2010) ("a suspect who has received and

understood the *Miranda* warnings, and has not invoked his *Miranda* rights, waives the right to remain silent by making an uncoerced statement to the police").

{¶ 37} At the suppression hearing, the State presented the testimony of Detective Captain Kunkleman of the Troy Police Department. According to Kunkleman, on June 25, 2019, he and Detective Baker were investigating an aggravated burglary, aggravated robbery, and theft of a vehicle belonging to Beard. During the afternoon, the two detectives located the stolen vehicle in front of a monthly apartment rental in Piqua. Their investigation led them to suspect Washington of the offenses.

{¶ 38} While he, Detective Baker, and two Piqua officers (Officers Weber and May) were at the location where the stolen vehicle was found, they observed Washington driving past in another stolen vehicle. Officer Weber pursued Washington in a cruiser with his overhead lights activated. Officer May followed. Detectives Kunkleman and Baker also pursued in their unmarked SUV. Kunkleman testified that their SUV had lights and a siren, and their lights were activated.

{¶ 39} Washington's vehicle collided with another vehicle near the ramp to Interstate 75. When Kunkleman drove past, Washington was on foot and had climbed over a fence; Officer Weber was climbing over the fence in pursuit. The Troy detectives aptly drove around to the church parking lot on the other side of the fence. When the detectives stopped in the lot, Washington ran into the side of their SUV, slid across the back of their vehicle, and kept running. Detectives Kunkleman and Baker exited their vehicle and rushed after him. They caught up to Washington and took him to the ground. Washington continued to struggle until Officer Weber threatened to use a Taser on him.

Detective Kunkleman testified that he placed Washington in handcuffs and then read him his *Miranda* rights from a card that he (Kunkleman) carries with his badge. A copy of the card was offered into evidence. Washington did not sign a written waiver of his *Miranda* rights.

{¶ 40} Washington complained that the asphalt was hot and that he could not breathe. The officers raised him to a seated position and called for medics. Washington did not lose consciousness, and Kunkleman did not observe any bleeding or any head injury. Kunkleman stated that he tried to speak with Washington about the case they were investigating. Washington responded but did not provide any information. While waiting for the ambulance, they also spoke about a prior interaction they had had, and Kunkleman stated that Washington's recollection of the prior encounter was accurate. Kunkleman further testified that Washington indicated that he wanted to help or "be on our side" about the charges he was facing.

{¶ 41} According to Detective Captain Kunkleman, Washington did not appear to be confused by any of the questions or comments, and his responses were appropriate. Although Washington had indicated that he was a drug user, he did not appear to be under the influence at that time, nor did not appear to be dizzy or disoriented. Kunkleman did not recall if Washington had slurred speech. When the medics arrived, Washington was able to explain to them what and how he was feeling.

{¶ 42} Kunkleman accompanied Washington to the hospital. Washington was seated upright during transport, and Kunkleman did not recall the use of any medical intervention, such as an IV, oxygen, neck stabilizer, or other medical equipment.

**{¶ 43}** While in the ambulance, Kunkleman and Washington had another conversation about the case they were investigating. Washington expressed that he wanted to help himself out, to which the detective responded that Washington had to be honest and tell the detective who else was involved in the Troy incident. When Washington replied that he would talk off-the-record, Kunkleman explained that nothing was off-the-record. The conversation then ended.

**{¶ 44}** Once at the hospital, Washington spoke coherently with hospital personnel. He stated that he did not want a blood draw because he did not like needles. Washington asked the detectives to contact his mother. He mostly slept. The detectives stayed at the hospital for at least a couple of hours and left before Washington was discharged.

**{¶ 45}** Washington testified on his own behalf. He stated that he had been driving his nephew's Jeep, with his nephew's permission, at approximately 60 mph when he crashed into a steel trailer hitch. He was not wearing a seatbelt and, upon crashing, hit his head on "the thing that separates the driver window." Washington said that "everything was looking fuzzy," and he recalled an SUV speeding past, someone pulling out a gun, his trying to jump over a fence, and staggering through the parking lot. Washington stated that the SUV then cut him off, and he smacked into it, bounced off, and fell to the ground. Washington saw "two guys in plain clothes drawing guns, so I tried to get up and stagger away and that's when they slammed me to the ground on my face." The officers had their knees in his back and on his head, and he was bleeding. Washington told them that he could not breathe. He testified that he recalled seeing spots, being strapped to something in an ambulance, and then being at the hospital.

{¶ 46} Washington testified that he had never been informed of his *Miranda* rights, and he did not recall talking to Kunkleman in the ambulance. He said he was "out of it." He recalled being poked and awakened at the hospital, but "at this point I don't even know what's going on." Washington remembered being awakened and told to stand up because he was going to jail.

{¶ 47} In denying Washington's motion to suppress, the trial court found Detective Captain Kunkleman's testimony to be credible and Washington's testimony not to be credible. Although the trial court found that Washington had been in custody after he was apprehended and handcuffed, it concluded that Washington's statements were not the product of an interrogation by the detective. Rather, Washington had made voluntary statements in an attempt to aid himself. The trial court further concluded, alternatively, that Washington had knowingly, intelligently, and voluntarily waived his *Miranda* rights. The court rejected Washington's claim that the totality of the circumstances, primarily his alleged head injury, rendered his statements involuntary.

{¶ 48} On appeal, Washington claims that a custodial interrogation occurred while he was being transported by ambulance to the hospital. He argues that the trial court should not have believed Kunkleman's testimony that he informed Washington of his *Miranda* rights and, instead, should have credited Washington's testimony that the detective did not read him those rights. Washington notes that he did not sign a written waiver of his *Miranda* rights.

{¶ 49} We reiterate that the weight of the evidence and the credibility of the witnesses at a suppression hearing are primarily for the trial court to determine. *State v.*

*Moore*, 2d Dist. Montgomery No. 29143, 2022-Ohio-283, ¶ 8, citing *State v. Brinkley*, 105 Ohio St.3d 231, 2005-Ohio-1507, 824 N.E.2d 959, ¶ 58.   The trial court expressly found that Kunkleman's testimony was believable and that Washington's conflicting testimony was not.   In doing so, the trial court devoted a paragraph of its decision to describing inconsistencies in Washington's testimony.   Kunkleman testified that he read Washington his *Miranda* rights from a card that he keeps with his badge, and a copy of that card was submitted into evidence.   Although Washington disputes that his rights were read to him, the trial court reasonably found that Kunkleman informed Washington of his *Miranda* rights.

{¶ 50} Even if we were to accept Washington's assertion that he was not read his *Miranda* rights, we agree with the trial court that no interrogation occurred in the ambulance.   Kunkleman testified that Washington initiated the conversation about the investigation, indicating that he wanted to him get himself out of trouble and "be on our side."   Kunkleman responded that Washington had to be honest and needed to identify the other individuals who were involved in the incident in Troy earlier in the day. Washington replied that he would talk off-the-record.   When Kunkleman indicated that nothing would be off-the-record, Washington made no further statements.   Washington's statements were voluntary, spontaneous statements and not in response to any police questioning.   Nothing in the brief conversation between Washington and Kunkleman involved express questioning by the detective, nor were Kunkleman's responses to Washington likely to elicit an incriminating response.

{¶ 51} Washington's sixth assignment of error is overruled.

### III. Speedy Trial

{¶ 52} In his third assignment of error, Washington claims that the trial court erred in denying his motion to dismiss on the ground that his speedy trial rights were violated.

{¶ 53} The right to a speedy trial is guaranteed by the Sixth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution. Ohio's speedy trial statute, R.C. 2945.71, "was implemented to incorporate the constitutional protection of the right to a speedy trial." *Brecksville v. Cook*, 75 Ohio St.3d 53, 55, 661 N.E.2d 706 (1996). Accordingly, the speedy trial statutes must be strictly construed against the government. *Id.*

{¶ 54} R.C. 2945.71 designates specific time requirements for the government to bring an accused to trial. Under that statute, a felony defendant must be brought to trial within 270 days of arrest. R.C. 2945.71(C). Each day during which the accused is held in jail in lieu of bail on the pending charge is counted as three days. R.C. 2945.71(E). "When multiple charges arise from a criminal incident and share a common litigation history, pretrial incarceration on the multiple charges constitutes incarceration on the 'pending charge' for the purposes of the triple-count provision of the speedy-trial statute, R.C. 2945.71(E)." *State v. Parker*, 113 Ohio St.3d 207, 2007-Ohio-1534, 863 N.E.2d 1032, paragraph one of the syllabus.

{¶ 55} A defendant can establish a prima facie case for a speedy trial violation by demonstrating that the trial was held past the time limit set by statute for the crime with which the defendant is charged. *State v. Gray*, 2d Dist. Montgomery No. 20980, 2007-Ohio-4549, ¶ 15. "If the defendant can make this showing, the burden shifts to the State

to establish that some exception[s] applied to toll the time and to make the trial timely. If the State does not meet its burden, the defendant must be discharged. R.C. 2945.73." *Id.*

{¶ 56} The time within which a defendant must be brought to trial may be extended only for the reasons specifically enumerated in R.C. 2945.72. *State v. Brewer*, 2d Dist. Montgomery Nos. 22159, 22160, 2008-Ohio-2715, ¶ 37, citing *State v. Palmer*, 84 Ohio St.3d 103, 702 N.E.2d 72 (1998). Those reasons include:

(A) Any period during which the accused is unavailable for hearing or trial, by reason of other criminal proceedings against him, within or outside the state, by reason of his confinement in another state, or by reason of the pendency of extradition proceedings, provided that the prosecution exercises reasonable diligence to secure his availability;

* * *

(C) Any period of delay necessitated by the accused's lack of counsel, provided that such delay is not occasioned by any lack of diligence in providing counsel to an indigent accused upon his request as required by law;

* * *

(D) Any period of delay occasioned by the neglect or improper act of the accused;

(E) Any period of delay necessitated by reason of a plea in bar or abatement, motion, proceeding, or action made or instituted by the accused;

\* \* \*

(G) Any period during which trial is stayed pursuant to an express statutory requirement, or pursuant to an order of another court competent to issue such order;

(H) The period of any continuance granted on the accused's own motion, and the period of any reasonable continuance granted other than upon the accused's own motion;

R.C. 2945.72.

{¶ 57} Sua sponte continuances fall within continuances "granted other than on the accused's own motion." R.C. 2945.72(H). When continuing a case sua sponte, the trial court must enter the order of continuance and the reasons for the order by journal entry prior to the expiration of the time limits prescribed in R.C. 2945.71 for bringing a defendant to trial. *State v. Ramey*, 2012-Ohio-6187, 986 N.E.2d 462, ¶ 12 (2d Dist.); *State v. Mincy*, 2 Ohio St.3d 6, 9, 441 N.E.2d 571 (1982). "The journalization of reasons is necessary to permit the appellate court to determine whether, on the accused's claim that his statutory speedy trial rights were violated, the period of delay resulting from the sua sponte continuance was nevertheless 'reasonable.' R.C. 2945.72(H)." *Ramey* at ¶ 13.

{¶ 58} Washington was arrested on June 25, 2019. On February 17, 2020, he filed the first of several motions to dismiss the case on speedy trial grounds. The trial date was vacated, and the court set a hearing on the motion for March 17, 2020. That hearing date was continued at defense counsel's request, and Washington withdrew his

motion to dismiss on March 27, 2020. That same day, the court set a new hearing date (April 14) for the motion to dismiss. Although the motion had been withdrawn, the court nevertheless issued a decision on the speedy trial motion on April 13, 2020. After providing a detailed timeline of Washington's case, the court concluded that, as of March 27, 2020, a total of 211 speedy trial days were assessed to the State and, therefore, the State had 59 days remaining to bring him to trial. The court determined that Washington's speedy trial time was set to expire on May 24, 2020.

{¶ 59} At a hearing on June 11, 2020, the trial court and the parties addressed Washington's speedy trial time in light of H.B. 197, the COVID-19 emergency relief bill which, among other things, tolled certain time limitations and deadlines. Am.Sub.H.B. 197. In a decision filed on July 6, 2020, the court concluded that, as of June 19, 2020, the State had 24 days within which to bring Washington to trial and that time would expire on July 12, 2020. Under its interpretation of H.B. 197's tolling provision, the trial court concluded (contrary to the positions of both the State and Washington) that the speedy trial time did not stop between March 9 and July 30, the tolling period under H.B. 197, but rather that the State had an additional 126 days (representing March 9 to July 12) to bring Washington to trial, resulting in a speedy trial deadline of December 3, 2020.

{¶ 60} Washington absconded on August 19, 2020, and he was returned to Miami County on September 7, 2020. On September 11, Washington again moved to dismiss on speedy trial grounds. He claimed that 250 days had expired prior to March 9, that he was entitled to an additional 21 days from July 30 to August 19, and that he should have been credited with another 8 days from September 4 to September 11. The trial court

denied the motion, concluding that the State had 99 days remaining as of September 11, 2020. Washington's jury trial began on November 9, 2020.

{¶ 61} It is apparent that, without tolling, Washington's case was pending beyond the 270-day statutory speedy trial time. Washington was arrested on June 25, 2019, and his trial commenced on November 9, 2020, more than 270 days later. We note that Washington filed numerous motions during the pendency of his case, including motions for a bond reduction, a motion to suppress, a motion to sever, a motion for reconsideration, motions for continuance, a motion for co-counsel, motions for recusal, affidavits of disqualification, motions for medical furlough, and others.

{¶ 62} On appeal, Washington asserts that 281 speedy trial days elapsed prior to his trial. He calculates that 250 speedy trial days elapsed between June 26, 2019 (the day after his arrest) and February 18, 2020, when he states that his motion to dismiss on speedy trial grounds was filed. (The motion was, in fact, filed on February 17.) He states that his speedy trial time began to run again on July 30, 2020, and continued until August 19, 2020 (when he absconded), bringing his total to 271 days. In addition, he argues that he was entitled to 10 days for the period between September 4, 2020 and September 11, 2020, a portion of which, he states, qualified under the triple-count provision. Washington implicitly concedes that the remaining time between the day after his arrest and his trial were tolled.

{¶ 63} The State disputes a few portions of Washington's calculation. It asserts that the following time periods also should not count against the State for speedy trial purposes: (1) July 2, 2019 to July 8, 2019 – 21 speedy trial days; (2) July 19, 2019 to July

22, 2019 – 12 speedy trial days; and (3) September 4, 2020 to September 7, 2020 – 12 speedy trial days. The State thus asserts that Washington's calculation should be reduced by 45 days. For purposes of our analysis, we will accept the undisputed portions of Washington's calculation.

{¶ 64} The period from July 2, 2019 to July 8, 2019 occurred when the charges were pending in Miami County Municipal Court. (*See* Exhibits to State's Mar. 2, 2020 Mem.) Washington's preliminary hearing originally was scheduled for July 2, 2019. However, defense counsel had been appointed earlier that day, and counsel had not had an opportunity to review the materials necessary to proceed. At defense counsel's request and pursuant to Crim.R. 5(B)(1), the municipal court granted a continuance of the preliminary hearing until July 9, 2019. (State's Suppl. Response, Ex. 39). Based on the record, the seven-day continuance of the preliminary hearing was done on behalf of defense counsel and was reasonable. Those seven days were chargeable against Washington for speedy trial purposes and do not count toward his speedy trial time.

{¶ 65} The State next focuses on July 19 to 22, 2019. On July 18, 2019, Washington was arrested on an unrelated charge of harassment with a bodily substance based on conduct at the jail. *See State v. Washington*, Miami M.C. No. 2019 CR A 2541. Washington was scheduled to be arraigned on the new charge on July 19, 2019, but he refused to appear. His arraignment was held on July 23, 2019. The State asserts that the four-day delay should be charged against Washington. However, we fail to see (and the State fails to explain) how Washington's conduct in his unrelated case tolled his speedy trial time in this case. These four days are chargeable to the State in this case.

{¶ 66} Finally, the State claims that the time from September 4, 2020, when he waived extradition from Oklahoma, until September 7, 2020, when he was returned to Miami County, do not count toward Washington's speedy trial time. We agree with the State.

{¶ 67} Speedy trial time is extended for any period during which Washington was unavailable for hearing or trial "by reason of his confinement in another state, or by reason of the pendency of extradition proceedings." R.C. 2945.72(A). We have held that, following a waiver of extradition, a defendant's speedy trial time does not begin to run until he or she is returned to Ohio. *State v. Wilson*, 2d Dist. Montgomery No. 24577, 2012-Ohio-3098, ¶ 11. Other Ohio appellate courts have held similarly. *E.g.*, *State v. Helms*, 7th Dist. Mahoning No. 14 MA 96, 2015-Ohio-1708, ¶ 24 ("Where the prosecution did not unreasonably delay extradition, arrest in another state on an Ohio warrant and confinement awaiting extradition does not count toward the speedy trial clock and the time is tolled until the defendant arrives in Ohio."); *State v. Wilson*, 8th Dist. Cuyahoga No. 107926, 2019-Ohio-2741, ¶ 10. In addition, the date of the defendant's re-arrest in Ohio is not counted as part of the speedy trial time. *Wilson*, 2d Dist. Montgomery No. 24577, 2012-Ohio-3098, at ¶ 10. Accordingly, the period from September 4, 2020, when Washington waived extradition, through September 7, 2020, when he was returned to Ohio, was tolled.

{¶ 68} In summary, Washington's speedy trial time was tolled for the periods between July 2 and July 8, 2019, and September 4 and September 7, 2020. Those periods constituted a total of 25 speedy trial days. Upon reducing Washington's

calculated speedy trial time by those days, only 256 speedy trial days had elapsed when Washington's trial began.   Accordingly, the trial court did not err in denying Washington's motion to dismiss based on a violation of his speedy trial rights.

{¶ 69} Washington's third assignment of error is overruled.

### IV. Motion for Separate Trials

{¶ 70} In his fourth assignment of error, Washington claims that the trial court erred in denying his motion for separate trials.   He emphasizes that the charges in the indictment "were allegedly committed in three separate cities against four different alleged victims."   He argues that, if the charges had been severed, the evidence in each count would not have been admissible in the other cases.

{¶ 71} Multiple offenses may be charged in the same indictment if the offenses "are of the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct."   Crim.R. 8(A). Joinder of such charges is favored as it conserves judicial resources, minimizes the possibility of incongruous results that can occur in successive trials before different juries, and diminishes the inconvenience to witnesses. *State v. Broadnax*, 2d Dist. Montgomery No. 21844, 2007-Ohio-6584, ¶ 33; *State v. Hamblin*, 37 Ohio St.3d 153, 158, 524 N.E.2d 476 (1988).

{¶ 72} Nevertheless, a defendant may request separate trials on the ground that he or she is prejudiced by the joinder of offenses.   Crim.R. 14.   The defendant "has the burden of furnishing the trial court with sufficient information so that it can weigh the

considerations favoring joinder against the defendant's right to a fair trial." *State v. Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, 140 N.E.3d 616, ¶ 104, quoting *State v. Torres*, 66 Ohio St.2d 340, 343, 421 N.E.2d 1288 (1981).

{¶ 73} Even if the equities support severing the charges, the State can overcome the defendant's claim of prejudicial joinder in two ways. First, the State can show that it could have introduced evidence of the joined offenses as other acts under Evid.R. 404(B). *Ford* at ¶ 104. Alternatively, the State can show that the evidence of each crime joined at trial is "simple and direct." *Id.*, quoting *State v. Lott*, 51 Ohio St.3d 160, 163, 555 N.E.2d 293 (1990); *Broadnax* at ¶ 38. The "simple and direct" test is satisfied if the trier of fact would not confuse the offenses or improperly cumulate the evidence of the various crimes. *Lott* at 164; *Broadnax* at ¶ 38. "[W]hen simple and direct evidence exists, an accused is not prejudiced by joinder regardless of whether the evidence is admissible as other-acts evidence." (Citations omitted.) *State v. Coley*, 93 Ohio St.3d 253, 260, 754 N.E.2d 1129 (2001), citing *Lott* at 163.

{¶ 74} We review a trial court's denial of a Crim.R. 14 motion for an abuse of discretion. *State v. Pate*, 2021-Ohio-1838, 173 N.E.3d 567, ¶ 36 (2d Dist.); *Ford* at ¶ 106. "A trial court abuses its discretion when it makes a decision that is unreasonable, unconscionable, or arbitrary." (Citation omitted.) *State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, ¶ 34. In order to meet this standard, a defendant must "affirmatively demonstrate (1) that his [or her] rights were prejudiced, (2) that at the time of the motion to sever he provided the trial court with sufficient information so that it could weigh the considerations favoring joinder against the defendant's right to a fair trial, and

(3) that given the information provided to the court, it abused its discretion in refusing to separate the charges for trial." *Ford* at ¶ 106, quoting *State v. Schaim*, 65 Ohio St.3d 51, 59, 600 N.E.2d 661 (1992).

{¶ 75} The State claims that it can overcome Washington's claim of prejudicial joinder under either test. We agree with the State that Washington was not prejudiced by the joinder of the various offenses because the evidence pertaining to each group of offenses was simple and direct. Although the events from the separate incidents flow from one to another, the incidents themselves – the theft of the Jeep, the offenses at Beard's home, the burglary of Milby's home, and the offenses stemming from the car chase – are easily differentiated and uncomplicated. The jury was capable of discerning the evidence relevant to each charge, and there was little possibility that the jury would confuse the various incidents to Washington's prejudice. Accordingly, the trial court did not abuse its discretion in denying Washington's motion for separate trials.

{¶ 76} The State further asserts that the evidence regarding the various incidents would be admissible at the other trials if the offenses were severed. Because we have concluded that Washington did not demonstrate prejudice under the "simple and direct" evidence test, we need not address the State's additional argument.

{¶ 77} Washington's fourth assignment of error is overruled.

## V. Defense Counsel's Motion to Withdraw

{¶ 78} In his ninth assignment of error, Washington claims that the trial court erred in denying his attorney's motion to withdraw prior to the start of trial. He argues that his defense counsel had a conflict of interest that required new counsel.

{¶ 79} An indigent defendant is entitled to competent representation by the attorney that the trial court appoints to represent him or her. *State v. Brock*, 2017-Ohio-759, 85 N.E.3d 1072, ¶ 25 (2d Dist.). A defendant's Sixth Amendment right to counsel includes the "correlative right to representation that is free from conflicts of interest." *Wood v. Georgia*, 450 U.S. 261, 271, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981); *State v. Gillard*, 64 Ohio St.3d 304, 311, 595 N.E.2d 878 (1992).

{¶ 80} When an objection is made by the defendant based on a conflict of interest, the trial court is constitutionally required to conduct an inquiry into the possible conflict of interest to determine if an actual conflict exists. *State v. Dillon*, 74 Ohio St.3d 166, 168, 657 N.E.2d 273 (1995); *Gillard* at syllabus; *Holloway v. Arkansas*, 435 U.S. 475, 484, 98 S.Ct. 1173, 1178, 55 L.Ed.2d 426 (1978) (when defense counsel informs the trial court of a potential conflict of interest, a trial court should either appoint new counsel or "take adequate steps to ascertain whether the risk was too remote to warrant separate counsel"). A trial court may explore the "adequacy of the basis of defense counsel's representations regarding a conflict of interests." *Holloway* at 487.

{¶ 81} Additionally, it is well established that a defendant has no right to representation by a particular attorney. *Id.*; *State v. Johnson*, 2d Dist. Champaign No. 2019-CA-7, 2019-Ohio-4595, ¶ 27. To justify the discharge of a court-appointed attorney based on a breakdown in the attorney-client relationship, the defendant generally must show that the breakdown is of such magnitude as to jeopardize the defendant's Sixth Amendment right to effective assistance of counsel. *Brock* at ¶ 25; *State v. Coleman*, 37 Ohio St.3d 286, 292, 525 N.E.2d 792 (1988).

**{¶ 82}** "[S]ubstitution of counsel is not warranted due to disagreements about trial strategy or tactics." *State v. Monahan*, 2d Dist. Darke No. 2018-CA-2, 2018-Ohio-4633, ¶ 58. Moreover, "mere hostility, tension and personal conflicts between attorney and client do not constitute a total breakdown in communication if those problems do not interfere with the preparation and presentation of a defense." *State v. Furlow*, 2d Dist. Clark No. 2003-CA-58, 2004-Ohio-5279, ¶ 12, citing *State v. Gordon*, 149 Ohio App.3d 237, 2002-Ohio-2761, 776 N.E.2d 1135, ¶ 12 (1st Dist.). "Competent representation does not include the right to develop and share a 'meaningful attorney-client relationship' with one's attorney." *Gordon* at ¶ 12; *see State v. Ware*, 2d Dist. Darke No. 2018-CA-8, 2019-Ohio-2595, ¶ 36.

**{¶ 83}** When reviewing whether a trial court erred in denying a motion for new counsel, an appellate court should consider: (1) the timeliness of the motion, (2) the adequacy of the trial court's inquiry into the matter, (3) the extent of the conflict between the attorney and client and whether it was so great that it resulted in a total lack of communication preventing an adequate defense, and (4) the balancing of these factors with the public's interest in the prompt and efficient administration of justice. *State v. Jones*, 91 Ohio St.3d 335, 342, 744 N.E.2d 1163 (2001), citing *United States v. Jennings*, 83 F.3d 145, 148 (6th Cir.1996); *State v. Lawson*, 2020-Ohio-6852, 164 N.E.3d 1130, ¶ 40 (2d Dist.).

**{¶ 84}** The decision whether to remove court-appointed counsel and allow substitution of new counsel is addressed to the sound discretion of the trial court, and its decision will not be reversed on appeal absent an abuse of discretion. *Furlow* at ¶ 13.

{¶ 85} Prior to the commencement of trial on Monday, November 9, 2020, Washington's lead attorney made a motion to withdraw as counsel. This was defense counsel's third request to withdraw; he previously had made an oral motion to withdraw on September 15, 2020 (a prior scheduled trial date) and filed a written motion to withdraw on October 29, 2020. Counsel's October 29, 2020 motion did not mention a conflict of interest. The trial court held a hearing on the written motion on November 2, 2020, before the final pretrial conference.

{¶ 86} On November 4, 2020, the trial court issued a detailed decision denying Washington's October 29, 2020 motion. In that decision, the trial court indicated that the primary basis for both the September 15 and October 29 requests to withdraw was that counsel and Washington were not seeing "eye-to-eye." The court noted that defense counsel stated at a September 18 status conference that the two had "cleaned up our differences" and that there was not, at that time, any issue with counsel's continued representation. At the status conference, the State had sought to submit a disc of a jail phone call made approximately 30 minutes after the jury had been released on September 15 and it was clear that the trial would not proceed; Washington had expressed on that call that he and his attorney had discussed how they would not be able to go forward with trial if Washington fired his attorney. The court commented in its decision on how Washington had repeatedly filed motions that had caused his trial dates to be delayed, and it detailed the numerous filings and "constant contact" defense counsel had with Washington, despite their claim that their communication had deteriorated. The court found the motion to be "just another trial tactic to cause delay" and found "no reason

that Counsel is not competent and able to proceed with trial." The court stated, in summary:

> There is no indication that [defense counsel] is not able to provide effective representation to the Defendant as he has thoroughly prepared for trial at each of its four settings. Additionally, the disagreements appear to be the Defendant refusing to communicate within a few days prior to trial and his dispute being with Counsel's trial procedures and tactics. The Defendant failed to establish "good cause" to substitute counsel. When evaluating the [relevant] factors, the Court notes: (1) the time of the motion being within days before trial and only 24 hours after Counsel was continuing to file motions on the Defendant's behalf; (2) the Court inquired of Counsel whether he was prepared for trial and gave the Defendant an opportunity to explain the conflict; (3) the conflict over not seeing eye-to-eye and when motions should be filed do not constitute such a conflict as to prevent an effective representation; and (4) the public's interest in efficient administration of justice outweighs the delay caused by a substitution of counsel. The Defendant is not denied effective representation. Counsel's motion to withdraw is denied.

(Footnotes omitted.) In a discursive footnote, the trial court commented that the (at that point) November 6, 2020 trial date was the fourth trial setting, that there were "10 counts in the superseding indictment, including qualifying offenses and specifications," and a "substantial delay would be required with a substitution of counsel." The decision did not

reference or address an actual or potential conflict of interest between Washington and his attorney.

{¶ 87} Prior to the beginning of trial on November 9, 2020, defense counsel renewed his motion to withdraw. At that time, both counsel and Washington expressed that they believed counsel was under criminal investigation. Defense counsel stated that the investigation was related to Washington's escape. (Trial Tr. 25.) Defense counsel told the court that when they called the investigating detective, the detective would not provide information about the case because it was an open investigation. Defense counsel declared that the pending investigation "hurts my ability to represent my client as I could possibly be a co-defendant and possibly at odds with him in another case," in addition to the previously-raised communication breakdown. (Trial Tr. 25.) Washington added that he and counsel had "bickered" ever since learning of the investigation and that it was "corrupt" to force him to be represented by someone who could become a co-defendant. Washington also said that he was called to talk to detectives on the previous Thursday about whether counsel was providing him drugs. (Trial Tr. 27-29.)

{¶ 88} In its follow-up questioning, the trial court asked Washington, "Whatever investigation is going on, you would agree that's unrelated to any of the charges in this case?" (Trial Tr. 27.) The court also asked him, "In relation to your counsel, if he's being investigated, it is not in regards to this case, correct?" (*Id.*) Washington did not concede that the matters were unrelated. The court further inquired, "So, your position is there's a conflict because the same detective or investigator is involved in both cases?" (Trial Tr. 28.) Washington replied, "No, that, too, but we're not seeing eye to eye. * * *" (*Id.*)

{¶ 89} When asked for the State's position, the prosecutor responded that the pending investigation, the details of which she did not know, had been raised "the last time this issue was addressed" and nothing new had been presented that day. (Trial Tr. 29-30.) She continued, "[S]o I don't think there is new information for the court to consider, but it is information that should be considered." (Trial Tr. 30.)

{¶ 90} Defense counsel contested the prosecutor's characterization, saying that he had just found out that Washington had been questioned by a detective and could have made incriminating statements against him. Counsel stated that he was unaware that Washington had been questioned by Detective Jessup if it happened on Thursday. (*Id.*) After Washington commented that he told counsel on the phone, counsel continued:

> I know, but it wasn't part of our Motion. Our Motion was on Monday. I get that; you're right, but I mean, that's an issue. First of all, why are they talking to my client without me present, and did they ask him if he wanted an attorney. Second of all, I don't know [what] he said, and that could further lead to the issues between me and him. I mean, how can I properly represent someone who may be testifying against me? I think that's an issue even though it's a different case, it's the same detective, and I think that's definitely a problem.

(*Id.*) The trial court asked counsel, "The investigation clearly is unrelated to the indictment in this case, correct?" Counsel replied, "It's the same detective, but it's a different case, that is correct." (*Id.*) The trial court then asked defense counsel several

questions related to his preparation for trial and the amount of his communications with his client.

**{¶ 91}** The trial court denied the oral motion, concluding that no conflict of interest existed because the alleged investigation of defense counsel did not involve the case presently before the trial court and, further, that none of the considerations relevant to a motion to withdraw favored substitution of counsel. The court stated: "There comes a point where the Defendant, I get you don't like what things go on, how you think things appear, but the case law is very clear that the Defendant does not get to choose his lawyer. Being that the facts of the case are regarding the investigation are something unrelated to this case, even if you became a co-defendant, which this court has no information on, you would presumably be on the same side as your client and the court does not see the conflict for that." (Trial Tr. 33.) After an extended outburst by Washington and his removal from the courtroom, the trial court orally reiterated the substance of its November 4, 2020 decision denying the prior motion to withdraw.

**{¶ 92}** On appeal, Washington claims that the trial court erred in denying defense counsel's motion to withdraw, because the pending investigation created a conflict of interest that required counsel's substitution. In its response, the State argues that there is no evidence on record about any investigation regarding Washington's primary defense counsel, only counsel's statement that he believed an investigation was ongoing. The majority of the State's argument reiterates the rationale provided by the trial court in its November 4, 2020 decision and repeated orally on November 9, 2020.

**{¶ 93}** On the record before us, we cannot conclude that the trial court abused its

discretion in denying defense counsel's motion to withdraw based on a conflict of interest. At the outset, we find no reference to a criminal investigation of defense counsel or counsel's claim of a conflict of interest prior to November 9, 2020. The issue apparently had been raised in conjunction with defense counsel's prior motion to withdraw, as reflected in the prosecutor's comment that "nothing new" had been said on November 9. Washington asserted on November 9 that defense counsel had been saying "for two weeks straight he's under investigation." (Trial Tr. 26.) However, any prior claim of a conflict of interest was not memorialized in the record.

{¶ 94} The record does not clearly demonstrate that defense counsel was, in fact, subject to a criminal investigation. Although defense counsel stated, as an officer of the court, that he believed that he was subject to a criminal investigation arising out of Washington's escape, that suspicion was not corroborated by the prosecutor or a law enforcement officer. Defense counsel told the court that when he called the detective, the detective would not talk about the case because it was an open investigation. The prosecutor indicated that she had no details about an investigation. In his remarks, Washington told the court that he had been questioned by Detective Jessup about his defense counsel on the previous Thursday (presumably November 5). The trial court gave no indication whether it believed or disbelieved Washington's statements about the alleged investigation.

{¶ 95} Regardless, the possible existence of a criminal investigation of defense counsel created a potential conflict of interest. However, an actual conflict of interest is required to find that Washington's Sixth Amendment rights were violated. *E.g., State v.*

*Johnson*, 2d Dist. Greene No. 2009-CA-16, 2010-Ohio-2838, ¶ 44.

{¶ 96} The trial court's thorough inquiry into the nature of the conflict focused on whether the investigation of defense counsel related to the case for which defense counsel had been appointed as counsel for Washington. The inquiry confirmed that, although the alleged investigation stemmed from defense counsel's representation of Washington in the case before the court, it involved conduct unrelated to the issues to be presented at trial. The court questioned defense counsel as to whether the investigation related to a different case, and defense counsel's acknowledged that it did. The court determined that no actual conflict of interest existed.

{¶ 97} It is apparent that the alleged investigation further fueled the distrust and animosity between Washington and defense counsel. And while it is conceivable that a substantial risk existed that defense counsel's cross-examination of Detective Jessup would be affected by the pending investigation, defense counsel was not Washington's sole attorney; co-counsel was available to conduct the cross-examination of that particular witness if concerns existed. The trial court was able to weigh that consideration, along with the other information available to it, as to whether defense counsel could effectively represent Washington at trial. We cannot say that the trial court abused its discretion in determining that the potential conflict of interest created by the pending investigation did not render defense counsel unable to effectively represent Washington at trial.

{¶ 98} Moreover, the trial court did not abuse its discretion in concluding that the relationship between Washington and his attorney did not warrant substitution of counsel.

The motion was filed on the morning of trial, with prospective jurors waiting. This was the third such motion in less than two months, and it was made on the fourth trial date. Jurors had been called to the courthouse and released on two of the prior scheduled trial dates. Although defense counsel told the court that the relationship between Washington and him had deteriorated even further, the court reasonably concluded that defense counsel was prepared for trial and that the condition of their relationship would not result in the denial of Washington's Sixth Amendment right to counsel. The trial court had reason to be suspicious of the motion to withdraw, as Washington had indicated in a September 15 jail phone call that such a motion could be used to delay trial. The trial court reasonably concluded that the interests of justice favored proceeding with trial that day with current counsel.

{¶ 99} Washington's ninth assignment of error is overruled.

## VI. Sufficiency and Manifest Weight of the Evidence

{¶ 100} Washington's fifth assignment of error claims that his convictions were against the manifest weight of the evidence. Although not specifically stated in his assignment of error, he also argues that the State's evidence was insufficient to support his convictions.

### A. Standards of Review

{¶ 101} "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678

N.E.2d 541 (1997). The relevant inquiry is whether any rational finder of fact, viewing the evidence in a light most favorable to the State, could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997). A guilty verdict will not be disturbed on appeal unless "reasonable minds could not reach the conclusion reached by the trier-of-fact." *Id.*

{¶ 102} In contrast, "[a] weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." (Citation omitted.) *Wilson* at ¶ 12; *see Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 19. When reviewing an argument challenging the weight of the evidence, an appellate court may not substitute its view for that of the trier of fact. Rather, we review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 103} Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997). The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence. *Wilson* at ¶ 14. A judgment of conviction should be reversed as being against the

manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

{¶ 104} "The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different." *Thompkins* at 386. However, where an appellate court determines that a conviction is not against the manifest weight of the evidence, the conviction is necessarily based on legally sufficient evidence. *State v. McLoughlin*, 2d Dist. Champaign No. 2017-CA-22, 2018-Ohio-2426, ¶ 8; *State v. Million*, 2d Dist. Montgomery No. 24744, 2012-Ohio-1774, ¶ 23.

{¶ 105} We note that, in other assignments of error, Washington has challenged the trial court's admission of certain evidence at trial. In reviewing claims based on the sufficiency and/or manifest weight of the evidence, we are required to consider all of the evidence admitted at trial, regardless of whether it was admitted erroneously. *State v. Brewer*, 121 Ohio St.3d 202, 2009-Ohio-593, 903 N.E.2d 284; *State v. Lawson*, 2020-Ohio-6852, 164 N.E.3d 1130, ¶ 86 (2d Dist.); *State v. Rosales*, 2d Dist. Montgomery No. 27117, 2018-Ohio-197, ¶ 16, citing *State v. Johnson*, 2015-Ohio-5491, 55 N.E.3d 648, ¶ 95 (2d Dist.). Accordingly, the outcome of those assignments of error has no bearing on whether the evidence at trial supported Washington's convictions.

### B. Offenses Involving David Beard

{¶ 106} Washington was convicted of aggravated burglary, aggravated robbery, felonious assault, and abduction related to his conduct involving David Beard. He asserts that the jury lost its way in convicting him of those offenses, because he was not present when they occurred. Washington emphasizes that Beard repeatedly changed his story about what occurred on the morning of June 25 and that he (Washington) had

an alibi for when the offenses occurred.

{¶ 107} According to the State's version of events, Washington and two others entered Beard's home without permission, likely through a kitchen window off of the back deck. After Beard returned home for work, Washington and another male repeatedly hit him in the hallway of the apartment. Beard was forced into his living room and restrained with masking tape. Multiple personal items were stolen. As a result of the assault, Beard briefly lost consciousness, and he suffered lacerations to his head and face and severe lacerations to his ear, which required treatment from a plastic surgeon.

{¶ 108} Beard identified "T" as one of the people involved in the offenses. Beard was familiar with "T" through his estranged wife, Shannon Yohey, and indicated that "T" had previously been to the apartment. Although the perpetrators wore masks that obscured their faces below the bridge of the nose, Beard stated that he recognized "T's" voice and the tattoo over his eye. Several witnesses identified "T" as Washington, and Washington called himself "T" in a recorded jail phone call. Beard consistently stated the three perpetrators were African-American, which eliminated Reedy (who is Caucasian) as a suspect; Washington is African-American.

{¶ 109} Later in the day on June 25, police officers saw Washington driving a stolen Jeep, which was found to contain Yohey's Michael Kors purse, Beard's medical insurance card (found within a woman's wallet), and a television that Beard identified as stolen from his apartment. Beard's Cobalt was located near Reedy's apartment, where Washington had been the previous day.

{¶ 110} Beard acknowledged at trial (and Detectives Kunkleman and Baker

likewise testified) that he was not initially forthcoming about what had occurred. Beard first told the police that he had been carjacked and next said that the assault occurred on the stairs to his apartment. At trial, Beard explained that he was worried about being evicted for having cats and police activity at his apartment. Beard had provided the same explanation to Kunkleman while at the hospital. Kunkleman testified that Beard was afraid of losing his apartment and cats and was "kind of emotional about it."

{¶ 111} Although there was no fingerprint or DNA evidence placing Washington in Beard's apartment when the incident occurred, the State presented additional evidence to corroborate that the events occurred in Beard's apartment as he testified. Troy Police Officer Chris Madigan and Detective Nicholas Freisthler searched Beard's apartment with Beard's consent and found physical evidence of the crimes. There appeared to be signs of a struggle by the back door and a window appeared to be disturbed. In the living room, officers located masking tape, a broken flower pot, and blood on the couch. A bloody shirt was positioned on the back deck. The kitchen cabinets were open. Officer Madigan, Detectives Kunkleman and Baker, and emergency room physician Dr. Christopher Miller all testified to Beard's injuries.

{¶ 112} Beard acknowledged on cross-examination that he smoked marijuana. However, he denied that he took heroin, and he testified on direct examination that he and Yohey were estranged due to her addiction to heroin.

{¶ 113} In his own testimony, Washington denied being at Beard's apartment on the morning of June 25, 2019, and he claimed that he had been at his mother's home in Dayton since the afternoon of June 24, 2019. The mother of Washington's teenaged

children, Jessica Mail, stated that she had spent the night with Washington at the home of Karen Hinders Nelson, Washington's mother. When Mail left the residence around 10:00 a.m. on June 25, Washington was still there. Nelson also testified that she awoke around 7:00 a.m. on June 25 and Washington was still there; she stated that he left around 11:00 a.m.

{¶ 114} Washington's alibi evidence was undermined by other evidence. Mail testified that she believed Washington had not been on his phone or moving around throughout the night, but Washington's phone reflected that he had made and received phone calls during the early morning hours of June 25, 2019, and his phone had recorded multiple step counts. In addition, the phone showed an elevation change amounting to one flight of stairs at 5:14 a.m. that morning; Nelson's home was a single story and did not have a flight of stairs. Mail also testified that Washington had had a video chat with his children after 2:30 p.m. on June 25. However, the car chase on North County Road 25A occurred about that time, and Washington was in police custody thereafter. Nelson provided inconsistent testimony about whether Washington had been awake when she woke up on June 25, and neither Mail nor Nelson had provided alibi information to the police prior to trial.

{¶ 115} During his testimony, Washington also provided a different characterization of his relationship with Beard and Yohey. He stated that Beard was a drug addict who would call his phone, and Beard had given him property, such as a hookah pipe, in exchange for drugs. Washington said he had been to Beard's apartment as recently as June 19 or 20, 2019 to bring him or Yohey drugs. Washington described

Beard's apartment as a "drug house everybody would get high at." (Trial Tr. 896.) He stated that he would sometimes go to the apartment three times a day, but he would meet people either outside or at the kitchen and then leave. He testified that he had last spent time inside the residence in early 2019. Washington denied that Yohey was his girlfriend, but he indicated that they had sexual relations, he "had love for her," and he had been in her bedroom at Beard's apartment. Washington claimed not to have any issues with Beard in June 2019.

{¶ 116} After the incident, Officer Madigan spoke with Beard's downstairs neighbor, who reported that he had heard a man and a woman arguing earlier in Beard's apartment.

{¶ 117} It was the province of the jury, as the trier of fact, to assess the witnesses' credibility and determine whether the State had proved, beyond a reasonable doubt, that Washington had committed the charged offenses. In reaching its verdicts, the jury was free to believe all, part, or none of each witness's testimony. *State v. Peterson*, 2d Dist. Montgomery No. 29061, 2021-Ohio-3947, ¶ 27. Although there was evidence from which the jury could have reached a different verdict on the charges related to Beard, we cannot conclude that the jury lost its way when it ostensibly credited the State's version of events and found that Washington had committed the offenses in Beard's apartment on the morning of June 25, 2019. Washington's convictions for aggravated burglary, aggravated robbery, felonious assault, and abduction were not against the manifest weight of the evidence and, given that conclusion, were necessarily based on sufficient evidence.

### C. Burglary of Milby's Residence

**{¶ 118}** Washington next claims that there was insufficient evidence that he entered Milby's residence and that his conviction for burglary was against the manifest weight of the evidence.

**{¶ 119}** Under R.C. 2911.12(A)(3), the State was required to prove that Washington "[t]respass[ed] in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, with purpose to commit in the structure or separately secured or separately occupied portion of the structure any criminal offense." Washington's argument challenges the jury's conclusion that he trespassed in Milby's home.

**{¶ 120}** No one saw Washington inside of Milby's home, and the State, instead, relied on circumstantial evidence that Washington had committed the burglary. Circumstantial evidence has the same probative value as direct evidence. *State v. Jenks*, 61 Ohio St.3d 259, 272, 574 N.E.2d 482 (1991), citing *State v. Nicely*, 39 Ohio St.3d 147, 529 N.E.2d 1236 (1988); *State v. St. John*, 2d Dist. Montgomery No. 27988, 2019-Ohio-650, ¶ 49. In some cases, "circumstantial evidence may be more certain, satisfying, and persuasive than direct evidence." *State v. Jackson*, 57 Ohio St.3d 29, 38, 565 N.E.2d 549 (1991).

**{¶ 121}** Milby's and Fergerson's testimony, if believed, established that Milby's home was burglarized during the early afternoon of June 25, 2019. Milby lived in a rural area on Piqua-Lockington Road. He was self-employed and left for work between 6:20 and 6:30 a.m. on June 25, 2019. Milby testified that Fergerson was at the house when

he left for work. At approximately 3:00 p.m., Fergerson contacted Milby and told him that "somebody had been in the house and things were all messed up." (Trial Tr. 440.) When Milby returned home, a closet had been ransacked, the gun safe was missing, and a bedroom dresser had been moved. The security system and other items from the house had been taken and several additional items had been stolen from the detached garage. Milby noticed that a dolly, which had been in his dining room and loaded with cases of bottled water, had been moved to the garage.

{¶ 122} Fergerson's testimony differed from Milby's in that she testified that her boyfriend, Hummins, also was at Milby's home on June 24, 2019 and continuing until approximately 11:30 a.m. on June 25, when Fergerson's mother picked them up. Fergerson was unsure if the kitchen door had been locked when she left. Fergerson stated that her mother dropped off Hummins and then drove her to buy drugs from Washington near his Downing Street residence. Afterward, Fergerson and her mother were together until 2:45 or 3:00 p.m., when Fergerson's mother returned her to Milby's home. Fergerson discovered that something was awry soon after.

{¶ 123} According to Milby and Fergerson, no one had permission to be at Milby's house when they were not there, and no one was home between approximately 11:30 a.m. and 2:30 p.m. on June 25. Based on Milby's and Fergerson's testimony, the jury could have reasonably concluded that someone had burglarized Milby's home.

{¶ 124} Although no direct evidence placed Washington inside the residence during the burglary, a fingerprint from Washington's right hand was located on the dolly found in the garage. Milby believed the dolly likely was used to move the gun safe, which

weighed in excess of 400 pounds. Fergerson testified that Washington had previously been to Milby's residence to sell her drugs, including on June 24 when she met Washington in Milby's driveway. In addition, shortly after the burglary, Washington was found in possession of numerous items that had been stolen from Milby's home. Milby testified that he had not given Washington permission to enter his home or garage or to use his dolly, and that there was no lawful reason why Washington had possession of his property. Construing the evidence in the light most favorable to the State, there was sufficient evidence that Washington trespassed in Milby's home, used the dolly to steal the gun safe, and stole other personal property from Milby's house and garage.

{¶ 125} Washington denied being at Milby's residence on June 25, 2019, and stated that he had never entered Milby's home. He testified that he had come into contact with the dolly when Fergerson came to Downing Street to purchase crack cocaine from Owings on June 25. According to Washington, Fergerson drove up in a white truck with Hummins and another man (not Milby), and she wanted to trade the property inside for drugs. Washington stated that he used the dolly to help move a big safe from the truck into Owing's Jeep. Washington testified that he saw Fergerson "about 20 times" in a week, and both Fergerson and Milby had exchanged property for drugs in the past. Washington indicated that he had been to Milby's home on several occasions to sell drugs to both Fergerson and Milby, but had never been inside the home.

{¶ 126} The jury heard both versions of events and was able to assess each witness's credibility. Although the jury could have determined otherwise, it evidently believed that Washington had burglarized Milby's home. Upon review of the entire trial,

this case does not present the exceptional circumstance where Washington's burglary conviction is against the manifest weight of the evidence, and thus, it was based on sufficient evidence.

### D. Receiving Stolen Property

{¶ 127} Washington further claims that his conviction for receiving stolen property should be reversed, because the State failed to prove that he knew the Jeep Cherokee was stolen.

{¶ 128} Washington acknowledged at trial that he was in the Jeep at the Sunoco gas station on June 24, 2019. He stated that Hecker was selling the Jeep to his nephew, Owings, and the transfer of title had been completed and notarized. Washington initially testified that Reedy drove to the Sunoco station with Hecker in the passenger seat; he and Owings were in the back seat. (Trial Tr. 888.) On cross-examination, Washington stated that he was not sure if Hecker was seated in the front passenger seat or in the back seat, but he was confident that Reedy was driving. Washington testified that Hecker did not want to go to Dayton with the others and asked to be dropped off at the gas station. Washington said that Reedy dropped him off at his mother's house in Dayton at around 3:30 p.m. that day.

{¶ 129} In contrast, Hecker testified that he drove his girlfriend's Jeep to the Sunoco gas station with Washington in the passenger seat and an incapacitated Reedy in the back seat. When he went into the Sunoco to pay for gas and buy a beverage, the vehicle was stolen. Hecker reported to the police that "T" and Reedy had driven off with the vehicle without permission. At trial, Hecker stated that he did not see who was

driving, but Washington had been in the front passenger seat. The State played Hecker's 911 call reporting the theft and presented a surveillance video from the Sunoco, which showed Hecker exiting the Jeep from the driver's side and heading to the store area. No one else exited or entered the Jeep before it left the gas station.

{¶ 130} The next day, Washington was found driving the Jeep. At that time, the Jeep had a temporary tag that was registered to Owings. However, when Lieutenant Weber talked with Owings about the Jeep, Owings never claimed ownership of the vehicle.

{¶ 131} The jury was free to believe Hecker's testimony that the Jeep was stolen at the gas station, and upon review of the evidence, the jury could have reasonably concluded that Washington knew that the Jeep was stolen, including that Washington himself had stolen the vehicle. Washington's conviction for receiving stolen property was based on sufficient evidence and was not against the manifest weight of the evidence.

**E. Failure to Comply**

{¶ 132} Finally, Washington claims that his conviction for failure to comply was based on insufficient evidence and against the manifest weight of the evidence. He emphasizes that he saw the police behind him but did not see or hear a signal (lights or siren) from the police officer. Washington further argues that the police lacked a reason to stop him as the Jeep was registered to Owings and he had Owing's permission to operate the vehicle.

{¶ 133} According to the State's evidence, Officer May responded to the Sunoco gas station on Hecker's theft complaint. He testified that he contacted dispatch for the

Jeep to be listed as stolen in the LEADS (Law Enforcement Automated Data System) database and a BOLO (Be on the Lookout) alert also was issued for the vehicle. Hecker told Officer May that Reedy and "T" were suspects in the theft.

{¶ 134} As Officer Weber, Officer May, Detective Baker, and Detective Captain Kunkleman were at the old Piqua Motel area regarding Beard's Chevy Cobalt, Officer Weber observed a Jeep Cherokee driving northbound on North County Road 25A. Weber asked May, "Is that your Jeep coming this way?" As the Jeep drove by, the driver looked toward the officers, and Weber and Kunkleman recognized Washington as the driver.

{¶ 135} Weber in his marked vehicle, Baker and Kunkleman in their unmarked SUV, and May in his cruiser all pursued the Jeep. Weber left first and tried to catch up with the Jeep. He testified that he activated his cruiser's lights and siren. Instead of stopping, the Jeep accelerated, zigzagged in traffic, and reached 60 to 80 mph in a 40 mph zone.

{¶ 136} Baker and Kunkleman's SUV was the second vehicle in pursuit, and Baker testified that he could see Weber's cruiser's lights in the distance. The Troy detectives' unmarked vehicle also had lights and a siren, and they employed them while they drove after the Jeep. Officer May followed, and when he caught up, he noticed the Jeep had hit the truck trailer on the Exit 83 ramp. Officer Weber's cruiser was stopped at the ramp, and neither Washington nor Weber was there. The overhead lights and siren of Weber's cruiser were still activated. The video from Officer May's cruiser showed Weber's parked police vehicle on the I-75 on-ramp with its overhead lights still activated.

{¶ 137} Washington claimed that he did not see or hear any signal to stop from the police officers. However, the jury could have sensibly rejected his testimony and believed the testimony of the law enforcement officers. Washington's conviction for failure to comply was based on sufficient evidence and was not against the manifest weight of the evidence.

{¶ 138} Washington's fifth assignment of error is overruled.

## VII. Prejudicial Testimony

{¶ 139} In his seventh assignment of error, Washington contends that the trial court erred in permitting the jury to hear prejudicial testimony. Specifically, Washington argues that the court should not have allowed the jury to hear a recording of an irrelevant phone call from the jail and that police officers should not have been allowed to testify about the functioning of a "Fitbit."

### A. Jail Phone Call

{¶ 140} Washington first challenges the admission of State's Exhibit 123, a recording of a portion of a phone call placed by Washington from the jail on July 4, 2019.

{¶ 141} During Detective Jessup's testimony, the detective stated that he had listened to some of Washington's recorded telephone calls and that the beginning of each call indicated that the call was subject to monitoring and recording. (Trial Tr. 617.) Jessup further testified that he was familiar with Washington's voice and recognized it when he heard it. When the prosecutor sought to play State's Exhibit 123, defense counsel asked to approach. The sidebar conversation was not transcribed, but the recorded call was played immediately after the sidebar concluded.

{¶ 142} State's Exhibit 123 is 4 minutes and 28 seconds long. During the conversation, Washington spoke with an unidentified woman. The woman complained that someone was "putting their hands" on her and "running their mouth" and she was getting tired of it. After Washington said he knew someone who could beat up the offending person, the woman asked who she was talking to. Washington identified himself as "T." The woman responded she thought she was talking to someone else. Washington asked if she knew Fergerson and "600," who Washington described as Fergerson's "dude" and his "brother." Washington advised to her contact "600." Washington then asked the woman to look up 600's telephone number on Messenger, which listed it under the account of someone named Abby; he provided his (Washington's) email address and password so she could do so. Washington further asked the woman to send Abby a message saying, "Tell bru make sure dude doesn't come to court Tuesday at 1." (Washington's preliminary hearing in this case was scheduled for Tuesday, July 9, 2019, at 1:00 p.m.) Washington also told the women to call 600's number and say something similar.

{¶ 143} Detective Jessup testified that the phone number mentioned during the phone call belonged to Hummins.

{¶ 144} Three witnesses later, the State called Dawn Thomas, the assistant jail administrator for the Miami County Sheriff's Office, as the last witness of the day. One of Thomas's duties was to administer Securis, the system used by the county jail to record calls placed by inmates. (Trial Tr. 648.) Thomas described how inmate calls are made and stored on a computer server, and she indicated that they are searchable. State's

Exhibit 123 again was played for the jury, and Thomas acknowledged the phone call as a call placed on July 4, 2019, and that the exhibit was a fair and accurate recording of the call.

{¶ 145} After the jurors were released for the day, the court put on the record that, during Detective Jessup's testimony, "[w]e did do a sidebar on the issue, but I told the parties after the jury was released we would put the full objection on the record." (Trial Tr. 652.) Defense counsel then argued that the prejudicial nature of State's Exhibit 123 outweighed its probative value, and it should have been excluded. He stated: "It doesn't tend to prove any element of any of the crimes my client's charged with in this matter. It doesn't even say who the alleged witness is that he's saying to go talk to or whatever, so based on that that is the extent of our objection to Exhibit 123, your honor." (*Id.*)

{¶ 146} The State responded that the purpose of the exhibit was to show consciousness of guilt, specifically that Washington was making efforts to prevent a witness from appearing at court. The prosecutor indicated that additional evidence would be presented to "bookend that call" and explain the court hearing to which Washington was referring. The State further argued that the call served to substantiate that Washington referred to himself as "T" and to demonstrate the relationship between Washington and Hummins, who was anticipated to be a defense witness. (Trial Tr. 652-653.) In response, defense counsel raised that Hummins and Washington, if he testified, could be questioned directly about their relationship and the recorded call was not the "best way to get that evidence in."

{¶ 147} The trial court overruled the objection, finding the call relevant to

Washington's identification and to the relationship between Washington and Hummins. Although the evidence did not directly relate to an element of the offense, the court reasoned that it was relevant to credibility. The court found that the probative value outweighed the prejudicial impact.

{¶ 148} "A trial court has broad discretion to admit or exclude evidence, and its exercise of that discretion will not be disturbed on appeal absent an abuse of discretion." *State v. Hunt*, 2d Dist. Darke No. 2018-CA-9, 2019-Ohio-2352, ¶ 27. A trial court abuses its discretion if it makes an unreasonable, unconscionable, or arbitrary decision. *Id*.

{¶ 149} When engaging in this gatekeeper capacity, the trial court must determine if potential evidence is relevant. *State v. Sutherland*, 2021-Ohio-2433, 173 N.E.3d 942, ¶ 24 (2d Dist.). To be relevant, evidence must have a "tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." Evid.R. 401. In other words, there must be some probative value to the evidence. Evid.R. 402.

{¶ 150} A trial court may still exclude relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice. Evid.R. 403. "Exclusion on the basis of unfair prejudice involves more than a balance of mere prejudice. If unfair prejudice simply meant prejudice, anything adverse to the litigant's case would be excludable under Rule 403. Emphasis must be placed on the word 'unfair.' Unfair prejudice is that quality of evidence which might result in an improper basis for a jury decision." *Oberlin v. Akron Gen. Med. Ctr.*, 91 Ohio St.3d 169, 172, 743 N.E.2d 890 (2001); *State v. Hatfield*, 2d Dist. Montgomery No. 28990, 2022-Ohio-148, ¶ 89. If the

evidence arouses the emotions or sympathies of the jury, evokes a sense of horror, or appeals to an instinct to punish, the evidence is likely unfairly prejudicial and should be excluded. *Id.*

{¶ 151} "[W]hen determining whether the relevance of evidence is outweighed by its prejudicial effects, the evidence is viewed in a light most favorable to the proponent." *State v. Lakes*, 2d Dist. Montgomery No. 21490, 2007-Ohio-325, ¶ 22. Courts have characterized Evid.R. 403 as an "extraordinary remedy" which should only be used "sparingly because it permits the exclusion of otherwise relevant evidence." *Sutherland* at ¶ 29, quoting *United States v. Meester*, 762 F.2d 867, 875 (11th Cir.1985). The major function of Evid.R. 403 is "limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect." *Id.*, quoting *United States v. McRae*, 593 F.2d 700, 707 (5th Cir.1979).

{¶ 152} Washington's recorded jail phone call was relevant to several issues at trial. First, while other witnesses had testified that Washington was known as "T," Washington corroborated that testimony by identifying himself as "T" during the phone call. Second, as argued by the State, Washington's efforts to have a witness in his case not appear for a court hearing were relevant to Washington's credibility and consciousness of guilt. Third, the conversation illuminated the relationship between Washington and Hummins, who was Fergerson's boyfriend in June 2019 and allegedly had been to Milby's home, including on the day of the burglary. Washington described "600" as his "brother" and as someone who could "take care of anything you need to take care of, guaranteed." While Washington's statements were prejudicial to him, they were

not unduly prejudicial, and the prejudicial nature did not substantially outweigh their probative value. Even if we were to conclude that a portion of the recorded call was unduly prejudicial, we would find its admission to be harmless when considered in the context of the entire trial.

**B. "Fitbit" Evidence**

{¶ 153} Washington next challenges the admission of information from a health app on his cell phone.

{¶ 154} In response to Washington's evidence that he was sleeping at his mother's home on the night of June 24, 2019, the State presented two rebuttal witnesses: Detective Jessup and Detective Sergeant Todd Cooper of the Miami County Sheriff's Office. Detective Sergeant Cooper testified that he received an Apple cell phone from Detective Jessup, and he (Cooper) performed a forensic download of the cell phone onto a thumb drive using a UFED Touch2 device. All of the phone's contents were downloaded. Cooper then used a Physical Analyzer program by Cellebrite, which analyzed the information obtained from the cell phone and created a forensic report. (Trial Tr. 985-987.) The State presented screenshots of a call log report (State's Ex. 142) and an "activities" report (State's Ex. 143) created by the Cellebrite program.

{¶ 155} Detective Jessup testified about some of the information contained on the two Cellebrite reports. He discussed the call log, which showed that Washington made and received phone calls during the overnight hours of June 24-25. Jessup further testified regarding the activity log from the health app on Washington's phone, which showed steps taken, distance walked, flights of stairs climbed, and other data. Jessup

stated that the data for September 14, 2020 (line 12 on the report) reflected when he (Jessup) had unlocked the phone and was walking around with it. The entry below that (line 11) was for 10:47 a.m. to 10:54 a.m. on June 25, 2019. There was no activity recorded between those two entries.

{¶ 156} State's Exhibit 143, the activity log, contained the recorded health data between 9:49 p.m. on June 24, 2019, and September 14, 2020, when Detective Jessup unlocked the phone. Between 12:20 a.m. and 6:02 a.m. on June 25, 2019, the phone had 18 separate step-counter entries, reflecting movement of the phone. In addition, at 5:14 a.m., the phone registered a climb of one flight of stairs, which was defined by the health app as approximately 10 feet of elevation gain or approximately 16 steps. (Washington's mother's residence was a single-story double-wide trailer, which did not have a flight of stairs.)

{¶ 157} On cross-examination, Detective Jessup acknowledged that the phone data did not include where the phone was located, who had the phone, or what the person was doing.

{¶ 158} On appeal, Washington argues that neither Detective Sergeant Cooper nor Detective Jessup was offered as an expert on "Fitbit" technology. He contends that without an expert on the functioning of the "Fitbit," the evidence was offered without a proper foundation. We disagree with Washington that an expert was required to testify to the extraction of data from Washington's cell phone.

{¶ 159} The Rules of Evidence delineate two forms of witness testimony: lay and expert. "The distinction between lay and expert witness opinion testimony is that lay

testimony results from a process of reasoning familiar in everyday life, while expert testimony results from a process of reasoning which can be mastered only by specialists in the field." *State v. Wells*, 2d Dist. Clark No. 2021-CA-19, 2022-Ohio-30, ¶ 17, quoting 28 Ohio Jurisprudence 3d, Criminal Law: Procedure, Section 1641; *see State v. McKee*, 91 Ohio St.3d 292, 2001-Ohio-40, 744 N.E.2d 737.

**{¶ 160}** A lay witness may testify about opinions or inferences that are "(1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Evid.R. 701. In other words, a witness must have first-hand knowledge of the subject of his or her testimony and the opinion must be one that a rational person would form based on the observed facts. It also must help the trier of fact in understanding the testimony of the witness or determining a fact in issue. *Id.*

**{¶ 161}** Trial courts have considerable discretion in admitting the testimony of lay witnesses, and we evaluate the court's decision for abuse of discretion. *Brown v. Burnett,* 2020-Ohio-297, 144 N.E.3d 475, ¶ 28 (2d Dist.).

**{¶ 162}** We have historically held that a trial court does not err in allowing an individual to testify as a lay witness about his or her use of the Cellebrite program to extract cell phone data. *E.g.*, *State v. Hatfield*, 2d Dist. Montgomery No. 28990, 2022-Ohio-148, ¶ 111; *State v. Hemmelgarn*, 2d Dist. Darke No. 2018-CA-7, 2019-Ohio-2034, ¶ 34. In *Hemmelgarn*, we reasoned in part:

> * * * In the present case, most of [Police Officer] Marion's testimony did not
> even involve opinions or inferences. He simply testified, factually, about

extracting data from Hemmelgarn's phone using the Cellebrite program and listing that data in a generated report. All witnesses may testify as to facts within their personal knowledge. Evid.R. 602. To the extent that Marion did offer "opinion" testimony, he essentially opined that Cellebrite copies data from a phone. He based this "opinion" on knowledge he acquired through his own use of the program. Marion's testimony did not require a specialized understanding of the Cellebrite program, as the idea that data can be extracted from a cell phone is familiar to most people. Finally, to the extent that Marion arguably conducted any "analysis" of the data, he merely testified that a generated report showed content that had been extracted from the phone and content that had been deleted prior to examination. Again, this factual testimony did not involve any real opinions requiring specialized knowledge, training, or experience. Therefore, we agree with the trial court that Marion did not need to be qualified as an expert to testify about his use of the Cellebrite program in this case.

*Id*. at ¶ 34.

{¶ 163} As in *Hemmelgarn*, Detective Sergeant Cooper's testimony was factual in nature. He described the method he used to extract data from the Apple cell phone that he had received from Detective Jessup and identified reports that were generated. Cooper did not provide any opinions requiring specialized knowledge, training, or experience. The trial court did not err in permitting Cooper to testify as a lay witness.

{¶ 164} Detective Jessup's testimony similarly was factual in nature. Jessup's

testimony focused on the numbers of steps taken and the number of flights climbed, as reflected on the extraction report. The health application itself defined how the "step count" and "flights climbed" were calculated, and neither concept required a specialized understanding of the health application. (*See* State's Ex. 144.) Detective Jessup did not conduct an analysis of the data, nor did he offer an opinion on the accuracy of the information. As with Detective Sergeant Cooper, the trial court reasonably permitted Detective Jessup to testify as a lay witness regarding the health app reports.

**{¶ 165}** Washington's seventh assignment of error is overruled.

### VIII. Intoxicated Witness

**{¶ 166}** Washington's eighth assignment of error claims that the trial court erred in allowing an intoxicated person, Andrea Fergerson, to testify during the trial. He notes that Fergerson acknowledged during her testimony that she had used drugs that day, but the trial court failed to conduct a hearing or other inquiry into Fergerson's competence to testify.

**{¶ 167}** Fergerson testified on November 12, 2020, the third day of trial. She was the State's fifth witness that day, following Deputy Martin, Milby, Tracy Zehringer (latent print examiner), and Rosalind Fergerson (Andrea's mother). The court had a brief recess between Milby's and Zehringer's testimony.

**{¶ 168}** At the beginning of her direct examination, Fergerson acknowledged that she was a drug addict who had been using opiates for 16 years. She was 31 years old at the time of trial. She testified that she was "currently using" and had last used "[t]his morning." (Trial Tr. 529-530.) The State then asked Fergerson about drug treatment

she had received and the reason for her latest relapse.   At no point during Fergerson's testimony did defense counsel object or otherwise question Fergerson's competency to testify.

{¶ 169} In general, every person is competent to be a witness.   Evid.R. 601(A). A person may be disqualified as a witness if, among other things, the trial court determines that the person is "incapable of expressing himself or herself concerning the matter as to be understood," Evid.R. 601(B)(1), or is "incapable of understanding the duty of a witness to tell the truth," Evid.R. 601(B)(2).

{¶ 170} Because Washington failed to object to Fergerson's competency as a witness, we review the matter for plain error.   *See State v. Bahns*, 185 Ohio App.3d 805, 2009-Ohio-5525, 925 N.E.2d 1025, ¶ 25 (2d Dist.) ("Failure to object waives all but plain error.").   To constitute plain error, the error must be an obvious defect in the trial proceedings, and the error must have affected substantial rights.   *State v. Norris*, 2d Dist. Montgomery No. 26147, 2015-Ohio-624, ¶ 22; Crim.R. 52(B).   Plain error arises only when "but for the error, the outcome of the trial clearly would have been otherwise." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph two of the syllabus. Plain error should be noticed "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice."   *Id*. at paragraph three of the syllabus.

{¶ 171} With the record before us, we find no plain error in the court's allowing Fergerson to testify.   Although Fergerson acknowledged that she had used drugs that morning, there is no indication in the record that she was intoxicated when she testified.

Fergerson answered the prosecutor's questions clearly and appropriately. Nothing in her responses suggested that she either was incapable of appreciating her duties to tell the truth as a witness or of expressing herself coherently. If Fergerson displayed signs of intoxication, those signs are not memorialized in the record.

{¶ 172} Washington cites to *Prudential Ins. Co. of Am. v. Hashman*, 7 Ohio App.3d 55, 58, 454 N.E.2d 149 (4th Dist.1982) to support his assertion that the trial court should have conducted an inquiry into Fergerson's alleged intoxication. In contrast to the situation before us, the appellant in *Hashman* objected to the witness's testimony on the ground that he was intoxicated, thus raising the issue with the trial court. In addition, while the Fourth District found the trial court's failure to conduct an appropriate inquiry upon objection to be error, it nevertheless found the failure to be harmless where the witness's answers to questions were "responsive and coherent," and his testimony revealed the consumption of only one beer with his lunch. *Id.* at 58-59. Fergerson similarly testified coherently and responsively, and the record does not show her to be intoxicated. Thus, the record in this case does not demonstrate error, plain or otherwise, in the court's failure to conduct an inquiry sua sponte.

{¶ 173} Washington's eighth assignment of error is overruled.

### IX. Allied Offenses of Similar Import

{¶ 174} In his first and second assignments of error, Washington claims that the trial court erred in failing to merge allied offenses of similar import at sentencing. His first assignment argues that the two counts of having weapons while under disability should have merged, and his second contends that the aggravated robbery should have merged

with the felonious assault.

{¶ 175} The allied-offense statute, R.C. 2941.25, provides:

(A) Where the same conduct by [a] defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

This statute implements the protections of the Double Jeopardy Clauses of the United States and Ohio Constitutions, which prohibit a second punishment for the same offense. *State v. Fritz*, 182 Ohio App.3d 299, 2009-Ohio-2175, 912 N.E.2d 650, ¶ 9 (2d Dist.).

{¶ 176} "As a practical matter, when determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must ask three questions when the defendant's conduct supports multiple offenses: (1) Were the offenses dissimilar in import or significance? (2) Were they committed separately? and (3) Were they committed with separate animus or motivation? An affirmative answer to any of the above will permit separate convictions. The conduct, the animus, and the import must all be considered." *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, ¶ 31; *State v. Earley*, 145 Ohio St.3d 281, 2015-Ohio-4615, 49 N.E.3d 266, ¶ 12

(quoting *Ruff*); *State v. Davison*, 2d Dist. Montgomery No. 28579, 2021-Ohio-728, ¶ 29. Offenses are of dissimilar import within the meaning of the allied-offense statute "when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable." *Ruff* at ¶ 23.

**{¶ 177}** The defendant bears the burden of establishing that offenses should be merged as allied offenses. *State v. Albertson*, 2d Dist. Montgomery No. 28722, 2021-Ohio-2125, ¶ 95. We review the trial court's merger ruling de novo. *State v. Barnes*, 2d Dist. Montgomery No. 28613, 2020-Ohio-4150, ¶ 10.

### A. Having Weapons While Under Disability

**{¶ 178}** Washington was charged with two counts of having weapons while under disability, one in violation of R.C. 2923.13(A)(2) (felony offense of violence – Count 8) and the other in violation of R.C. 2923.13(A)(3) (drug offense – Count 9). Washington argues that the two counts should have merged.

**{¶ 179}** The trial court rejected Washington's merger claim, finding that "[w]hile there were two weapons found in the same vehicle, when looking at the evidence, there was separate animus for possession of each weapon, including clear and undisputed evidence that the revolver and rifle were obtained from different locations and on separate dates." It further reasoned that the two counts were "based upon different violations resulting in the prohibition, i.e., offense of violence and drug offense."

**{¶ 180}** Washington challenges both grounds for the trial court's ruling. First, he argues that the fact that he was under disability based on two separate prior convictions did not create multiple disabilities so as to justify multiple counts for a single weapon.

Second, he contends that the simultaneous possession of multiple weapons constitutes a single offense of having weapons while under disability.

**{¶ 181}** It is well established that when a defendant possesses different weapons at different times, each offense occurs as a result of separate conduct with a different animus. *See, e.g., State v. Dean*, 146 Ohio St.3d 106, 2015-Ohio-4347, 54 N.E.3d 80, ¶ 217. Under such circumstances, the multiple convictions are proper. Conversely, we have held that merger is required when a defendant had "simultaneous, undifferentiated possession" of multiple weapons. *State v. Mitchell*, 2014-Ohio-5070, 21 N.E.3d 1124, ¶ 27; *State v. King*, 2013-Ohio-2021, 992 N.E.2d 491 (2d Dist.).

**{¶ 182}** In *Mitchell*, three guns were located together in the closet of the defendant's master bedroom, and no evidence had been presented at trial establishing when he acquired any of the weapons. Under those facts, we held that the trial court erred when it failed to merge the three counts of having weapons while under disability. *Mitchell* at ¶ 28.

**{¶ 183}** Similarly, in *King*, the defendant had two guns in his possession when he fled from officers in his vehicle, and the record did not resolve whether he had acquired the guns at different times. Although the two guns were found by police at different times – one upon King's apprehension and the other when he was being booked into the jail – we concluded that King's continued possession of the second weapon "was not a separate act with a separate animus. Rather, it was continuation of his possession of both weapons while under disability." *Id.* at ¶ 39. We concluded that King "committed a single act with a single state of mind when he possessed the two guns" and, thus, the

trial court erred in failing to merge the two counts of having weapons while under disability as allied offenses of similar import.

{¶ 184} In this case, the evidence at trial court established that Washington simultaneously possessed two operable guns – the .38 Special revolver and the Ruger 22-caliber carbine model 10/22 rifle – in the Jeep when he fled from law enforcement officers on June 25, 2019. However, in contrast to *Mitchell* and *King*, the evidence further demonstrated that Washington had obtained these weapons at different times. Washington's phone contained a photograph, taken on June 20, 2019, of a hand holding a small revolver. (State's Exs. 138 & 138a.) That revolver appeared to match the revolver located in the console of the Jeep on June 24, 2019. (*See* State's Exs. 79-80, 126, 139.) A photo of Washington shows him wearing a watch and ring that appear to match the ones worn by the hand holding the gun. (State's Ex. 140.) As for the rifle, Milby testified that he had kept that rifle behind a dresser in his master bedroom, and it was missing after the burglary on June 25, 2019. The rifle located behind the driver's seat in the Jeep was identified as the rifle stolen from Milby.

{¶ 185} Accordingly, Washington's possession of the revolver and rifle was not simultaneous and undifferentiated. Rather, Washington obtained the weapons through different conduct at different times, and he possessed each with a different animus. Consequently, the trial court did not err in failing to merge the two counts of having weapons while under disability. We need not address the trial court's second rationale, i.e., that the different bases for the disability justified separate convictions.

{¶ 186} Washington's first assignment of error is overruled.

**B. Felonious Assault and Aggravated Robbery**

{¶ 187} Washington next argues that the trial court should have merged the felonious assault (Count 3) and aggravated robbery (Count 2) counts for sentencing. In support of this argument, he states that the evidence in support of the serious physical harm for purposes of the aggravated robbery was "essentially identical to" the serious physical harm caused for purposes of the felonious assault. Washington submits that the infliction of serious physical harm was a "necessary component" of the aggravated robbery. In its judgment of conviction, the trial court concluded that the aggravated robbery, felonious assault, and aggravated burglary counts related to Beard did not merge because they were each committed with a separate animus.

{¶ 188} We previously addressed the merge of felonious assault and aggravated robbery charges in *State v. Jefferson*, 2d Dist. Montgomery No. 27135, 2017-Ohio-1192. Jefferson had a history of doing odd jobs and handyman work for the victim, Reid, and Jefferson believed he had not been paid for work previously performed. The two men ran into each other by chance at a grocery store and exchanged words over the money allegedly owed. When in their own vehicles in the parking lot, Jefferson drove his pick-up truck into the driver's side door of Reid's vehicle; Reid believed he was briefly knocked unconscious. Jefferson then choked and beat Reid inside his vehicle. During the altercation, Jefferson demanded money from Reid and eventually took a necklace from Reid's neck and some lottery tickets from his pants pocket. Jefferson then left the scene. He pled guilty to two counts of felonious assault and one count of aggravated robbery. The trial court found that the counts did not merge.

**{¶ 189}** On review, we agreed with the trial court that the felonious assaults did not merge with the aggravated robbery. We noted that the harm caused by the beating was different from the harm caused by the robbery, and under *Ruff*, conduct "can support multiple convictions if the harm that results from each offense is separate and identifiable from the harm of the other offense." *Id.* at ¶ 14. We further stated that Jefferson's conduct, as reflected in a video of the incident, supported the conclusion that he was motivated by anger and vengeance over non-payment of the debt as well as his desire to obtain repayment. We reiterated that "the use of force far in excess of that required to commit a robbery may indicate a separate animus for another offense." *Id.*, citing *State v. Jackson*, 2d Dist. Montgomery No. 24430, 2012-Ohio-2335 (involving aggravated robbery and murder). We thus concluded that the trial court could have reasonably concluded that Jefferson had a separate animus for the felonious assaults and the aggravated robbery, and the court did not err in refusing to merge them. *Id.*

**{¶ 190}** Here, the State's evidence indicated that Beard returned to his home after work to find three others had entered his apartment uninvited. The group apparently had brought drugs into the apartment and used them in Yohey's bedroom before Beard came home. (Items consistent with drug use – a blow torch and foil – were in Yohey's bedroom which, according to Beard, were not there when he went to work on June 24. Trial Tr. 335; State's Ex. 9.) While walking toward the bedrooms, Washington came out of Yohey's former bedroom and assaulted Beard, hitting him on his head and face. When Beard resisted, a second man, identified as Diego, joined the assault. There was no indication that Washington and his accomplices were waiting for Beard so they could rob

him.

{¶ 191} After Beard ceased resisting, he was taken to his living room and restrained with masking tape.   He also was hit in the head with a clay pot, which broke as a result of the blow.   While in the living room, Washington repeatedly asked where "it" was, a question that Beard could not answer.   Upon leaving, the group took several items from inside the apartment and from Beard's pockets.   Beard's phone and car keys had been left outside on the deck, and they also took those items and his car.

{¶ 192} On this record, the amount of force used during the assault in the hallway went beyond the force necessary to commit the robbery, and the timing of events reasonably indicated that the assault was committed with a separate animus from the robbery.   Accordingly, the trial court did not err in failing to merge the felonious assault with the aggravated robbery.

{¶ 193} Washington's second assignment of error is overruled.

## X. Conclusion

{¶ 194} The trial court's judgment will be affirmed.

. . . . . . . . . . . . .

WELBAUM, J., concurs.

DONOVAN, J., concurs in part and dissents in part:

{¶ 195} I believe that an abuse of discretion is demonstrated in the trial court's failure to conduct an adequate inquiry into defense counsel's representation to the court that a conflict of interest existed in that counsel was subject to an open criminal

investigation by the State's law enforcement witness. I would remand the matter to the trial court for an adequate inquiry into the potential conflict of interest.

{¶ 196} "[M]ost courts have held that an attorney's request for the appointment of separate counsel, based upon his representations as an officer of the court regarding a conflict of interests, should be granted * * *." *Holloway*, 435 U.S. 475, 485, 98 S.Ct. 1173, 55 L.Ed.2d 426 (addressing conflict of interest based on dual representation). Defense counsel " 'is in the best position professionally and ethically to determine when a conflict exists or will probably develop at trial.' " *Id.* Further, "defense attorneys have the obligation, upon discovering a conflict of interests, to advise the court at once of the problem." *Id.* at 485-86. "[A]ttorneys are officers of the court, and 'when they address the judge solemnly upon a matter before the court, their declarations are virtually made under oath.' " *Id.* at 486, quoting *State v. Brazile*, 226 La. 254, 266, So.2d 856 (1954). The *Holloway* court further noted, however, that when an untimely motion for substitute counsel is made for dilatory purposes, a trial court may "deal with counsel who resort to such tactics." *Id.* at 486-87.

{¶ 197} "The Sixth Amendment right to counsel includes the 'correlative right to representation that is free from conflicts of interest." *State v. Sanchez*, 171 Wash. App. 518, 558, 288 P.3d 351 (2012), quoting *Wood v. Georgia*, 450 U.S. 261, 271, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981). "A conflict of interest can arise when a defendant's lawyer is under criminal investigation or charged with a crime in the same jurisdiction where the defendant is facing trial." *Id.* "Among the conflicting interests between counsel under investigation and his client * * * are the lawyer's possible interest in avoiding conflict with

prosecutors, the lawyer's possible interest in delay, and the lawyer's possible desire to reserve negotiation tactics for his own criminal proceeding." *Id.;* see *also Lafuente v. United States*, 617 F.3d 944, 946 (7th Cir.2010) ("If a criminal defendant's attorney is under investigation by the prosecutors of her client, there is a conflict."); *State v. Cottle*, 194 N.J. 449, 452, 946 A.2d 550 (2008) ("[A]n attorney has a per se conflict of interest when both he and his client are simultaneously under indictment in the same county and being prosecuted by the same prosecutor's office."); *Moss v. United States*, 323 F.3d 445, 472 (6th Cir.2003) ("[A] conflict of interest may arise where defense counsel is subject to criminal investigation. * * * [T]he alleging party must demonstrate a nexus between the crimes of the client and the attorney."). *Contrast, e.g., State v. Carter*, 84 So.3d 499, 511 (La.2012) ("[C]ounsel was under investigation by a different prosecutor and the pending charges against counsel were not related in any way to the murder charge against the defendant or counsel's representation of the defendant; therefore, the risk of a potential conflict of interest was greatly attenuated.").

**{¶ 198}** There is no evidence on the record that the issue of the criminal investigation came before the court until defense counsel made a new motion to withdraw on November 9, 2020.[1]  While the record does not clearly demonstrate that defense counsel was subject to an official criminal investigation, counsel stated, as an officer of the court and with an absolute ethical duty to be truthful, that he was subject to an investigation arising from Washington's escape.  Significantly, the State did not disavow

---

[1] In its decision of November 4, 2020, the court indicated that the primary basis for both the September 15 and October 29 requests to withdraw as counsel was merely that communications between Washington and defense counsel had deteriorated.

defense counsel's representation regarding the investigation. As noted by the majority, defense counsel advised the court that he believed he was "under investigation in this escape case that is a new charge for [Washington]," and that when "we called the detective, he will not tell me about the case. Says it's an open investigation." Counsel indicated, "I believe there's new information because I'm just finding out now that [Washington] got questioned, and he could have made further incriminating statements against me. I didn't know he was questioned by Detective Jessup if it happened on Thursday." After Washington indicated that he "told [defense counsel] on the phone" about being questioned, defense counsel responded, "but it wasn't part of our Motion. Our Motion was on Monday. * * * First of all, why are they talking to my client without me present, and did they ask him if he wanted an attorney. Second of all, I don't know what he said, and that could further lead to the issues between me and him." Defense counsel asked the court, "how can I properly represent someone who may be testifying against me?" He indicated, "that's an issue even though it's a different case, it's the same detective, and I think that's definitely a problem."

{¶ 199} When defense counsel informs the trial court that a potential conflict exists, the court should either appoint new counsel or "take adequate steps to ascertain whether the risk was too remote to warrant special counsel." *Holloway,* 435 U.S. 475, 484, 98 S.Ct. 1173, 55 L.Ed.2d 426.at 484. "If the trial court fails to undertake either of these duties, the defendant's Sixth Amendment rights are violated." *Sanchez* at 559.

{¶ 200} Reviewing the factors set forth by the majority in *Jones*, and acknowledging that the matter herein was already subject to repeated delays, I cannot

conclude that defense counsel's renewed motion to withdraw based upon the criminal investigation was for dilatory purposes, given his representation that he had just learned that Washington had purportedly been questioned by law enforcement, and that law enforcement advised him that there was an "open investigation." While the court conducted an inquiry on the record, questioning defense counsel and Washington regarding the renewed motion, it also appeared to conclude that any criminal investigation of defense counsel was separate, or removed, from counsel's representation of his client. The court indicated to defense counsel, "Being that the facts of the case regarding the investigation are something *unrelated* to this case, even if you become a co-defendant, * * * you would presumably be on the same side as your client and the court does not see a conflict in that." The trial court should not have presumed that counsel and his client would be on the same side, and I will not do so.

{¶ 201} In my view, the potential divergence of interests between counsel's continued zealous representation of Washington on the one hand and his being subject to investigation for possible criminal activity involving his client on the other hand mandated a more thorough inquiry regarding the nature of the investigation and the risk of the potential conflict. In other words, counsel demonstrated a sufficient nexus between the crimes of the client and the attorney, and I accordingly cannot conclude on this record that the investigation was not related to counsel's representation of Washington, or that the risk of a potential conflict was so greatly attenuated that further inquiry was unnecessary. In my view, the balance of the factors in *Jones* weighed in favor of the minimal delay required for a thorough inquiry involving Jessop's investigation,

since the issue before the court involved more than a breakdown in communication or disagreement about trial strategy between counsel and Washington. It would have been simple for the court to request the State to produce Jessop, the State's own witness, for direct inquiry about the open investigation before ruling on the motion to withdraw, and the fact that resolution of the issue would have been straightforward supports the conclusion that an abuse of discretion occurred. Accordingly, I would remand for a full inquiry to take place.

Copies sent to:

Paul M. Watkins
Kyle J. Lennen
Hon. Stacy M. Wall